# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 6, 2019

Lyle W. Cayce
Clerk

No. 17-20364

PATRICK J. COLLINS; MARCUS J. LIOTTA; WILLIAM M. HITCHCOCK,

Plaintiffs–Appellants,

v.

STEVEN T. MNUCHIN, SECRETARY, U.S. DEPARTMENT OF
TREASURY; DEPARTMENT OF THE TREASURY; FEDERAL HOUSING
FINANCE AGENCY; MARK A. CALABRIA, DIRECTOR OF THE FEDERAL
HOUSING FINANCE AGENCY,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, JONES, SMITH, DENNIS, OWEN, ELROD,
SOUTHWICK, HAYNES, GRAVES, HIGGINSON, COSTA, WILLETT, HO,
DUNCAN, ENGELHARDT, and OLDHAM, Circuit Judges.

DON R. WILLETT, Circuit Judge, joined by JONES, SMITH, OWEN, ELROD,
HO, DUNCAN, ENGELHARDT, and OLDHAM, Circuit Judges:

The bicentennial of the United States Constitution in 1987 celebrated
our Founding generation's ingenious system of separated powers: legislative,
executive, and judicial. The Constitution inaugurated a revolutionary design.
Madisonian architecture infused with Newtonian genius—three separate
branches locked in synchronous orbit by competing interests. "Ambition . . .
made to counteract ambition," explained Madison, making clear that this law

No. 17-20364

of constitutional motion, using friction to combat faction, was a feature, not a bug.[1] Our Constitution's most essential attribute, the separation of powers, *presumes* conflict, which, counterintuitively, produces equilibrium as the branches behave not as willing partners but as wary rivals. And our Constitution's paramount aim, preserving individual liberty, presumes that branches will behave neither centripetally (seizing other branches' powers) nor centrifugally (ceding their own), but jealously (defending their assigned powers against encroachment). No mere tinkerers, the Framers upended things. Three rival branches deriving power from three unrivaled words—"We the People"— inscribed on the parchment in supersize script. In an era of kings and sultans, nothing was more audacious than the Preamble's first three words, a script-flipping declaration that ultimate sovereignty resides not in the government but in the governed.

The Constitution's 200th birthday coincided with a centennial, the 100th birthday of the federal administrative state.[2] Congress's passage in 1887 of the Interstate Commerce Act, making railroads the first industry subject to federal regulation, and the Act's creation of the nation's first federal regulatory body, the Interstate Commerce Commission, profoundly altered the Framers' tripartite structure. The ICC was an amalgam of all three powers, blending functions of all three branches. The administrative state has sprouted since

---

[1] THE FEDERALIST NO. 51, at 349 (James Madison) (J. Cooke ed., 1961); *see also Mistretta v. United States*, 488 U.S. 361, 380 (1989) ("This Court consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty.").

[2] An Act to Regulate Commerce (Interstate Commerce Act), ch. 104, 24 Stat. 379 (1887). While many scholars peg the birth of the federal administrative state to the Interstate Commerce Commission, others point to other enactments, like the Pendleton Civil Service Reform Act of 1883, which created the United States Civil Service Commission, or the Steamboat Act of 1852, which created the Steamboat Inspection Service.

## No. 17-20364

then. But this iron truth endures: Even the most well-intentioned bureaucrats, no less than presidents, legislators, and judges, are bound by constitutional principles. An agency is restrained by the four corners of its enabling statute and "literally has no power to act . . . unless and until Congress confers power upon it."[3] And Congress, when creating agencies, is itself constrained—at all times—by the separation of powers.

\* \* \*

The plaintiffs (the Shareholders) own shares in Fannie Mae and Freddie Mac. In 2008 Fannie and Freddie's new regulator, the Federal Housing Finance Agency, placed them in conservatorship. FHFA secured financing from the Treasury to keep Fannie and Freddie afloat. That relationship continued, and in 2012 FHFA and Treasury adopted a Third Amendment to their financing agreements. Under the Third Amendment, Fannie and Freddie give Treasury nearly all their net worth each quarter as a dividend.

The Shareholders have two principal objections to this arrangement:

First, the Third Amendment exceeded FHFA's statutory powers. FHFA's enabling statute gives it general powers to use as either conservator or receiver. The statute grants other, more directed powers to FHFA as conservator or receiver respectively. As conservator, the agency may take actions "(i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."[4] These enumerated conservator powers don't vanish in the glare of the more general ones. Congress created FHFA amid a dire financial calamity, but

---

[3] *New York v. FERC*, 535 U.S. 1, 18 (2002) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

[4] 12 U.S.C. § 4617(b)(2)(D).

3

No. 17-20364

expedience does not license omnipotence. The Shareholders plausibly allege that the Third Amendment exceeded FHFA's conservator powers by transferring Fannie and Freddie's future value to a single shareholder, Treasury. In Parts I–VI of this opinion, a majority of the en banc court holds that this claim survives dismissal under Federal Rule of Civil Procedure 12(b)(6).

Second, the Shareholders argue that FHFA lacked authority to adopt the Third Amendment because its Director was not removable by the President. We adhere to the panel's reasoning and conclusion that FHFA's design, an independent agency with a single Director removable only "for cause," violates the separation of powers.[5] In Parts VII–VIII of this opinion, a majority of the en banc court holds that the Director's "for cause" removal protection is unconstitutional.

The remaining question is what remedy the Shareholders are entitled to. A different majority of the en banc court holds that prospective relief is the proper remedy. In Judge Haynes's opinion,[6] a majority holds that the Shareholders can only obtain a declaration that the FHFA's structure is unconstitutional.

We REVERSE the judgment dismissing Count I and REMAND that claim for further proceedings. We AFFIRM the judgment dismissing Counts II and III. The court REVERSES the judgment as to Count IV and REMANDS that claim for entry of judgment that the "for cause" removal limitation in 12 U.S.C. § 4512(b)(2) is unconstitutional.

---

[5] *Id.* § 4512(b)(2).

[6] Chief Judge Stewart, Judge Dennis, Judge Owen, Judge Southwick, Judge Graves, Judge Higginson, Judge Costa, and Judge Duncan join Judge Haynes's constitutional remedy opinion.

No. 17-20364

I

During last decade's housing-market crisis, Congress passed and President George W. Bush signed the Housing and Economic Recovery Act of 2008 (HERA).[7] The statute created FHFA as an independent agency to oversee the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). Fannie and Freddie are government-sponsored entities (GSEs) that also have private shareholders, including the plaintiffs in this case. Some background on FHFA and the GSEs is useful.[8]

A

Congress created Fannie Mae in 1938.[9] Its purposes include "provid[ing] stability in the secondary market for residential mortgages," "increasing the liquidity of mortgage investments," and "promot[ing] access to mortgage credit throughout the Nation."[10] Congress created Freddie Mac in 1970 to "increase the availability of mortgage credit for the financing of urgently needed housing."[11] Among other activities, Fannie and Freddie purchase mortgages originated by private banks, bundle the mortgages into income-producing securities, and sell the securities to investors.

In 2007, mortgage delinquencies and defaults sparked a bank liquidity crisis that kindled a recession. At the time, Fannie and Freddie controlled

---

[7] Pub. L. No. 110-289, 122 Stat. 2654 (codified in various sections of 12 U.S.C.).

[8] The facts relevant to Counts I–III (the APA claims) are taken from the Shareholders' complaint and are viewed in the light most favorable to them as the nonmovants. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facts relevant to Count IV (the constitutional claim) are undisputed unless otherwise noted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[9] National Housing Act Amendments of 1938, Pub. L. No. 75-424, 52 Stat. 8, 23.

[10] 12 U.S.C. §§ 1716, 1717.

[11] Federal Home Loan Mortgage Corporation Act, Pub. L. No. 91-351, preamble, 84 Stat. 450.

combined mortgage portfolios of approximately $5 trillion—nearly half the United States mortgage market. They suffered multi-billion dollar losses. Indeed, the GSEs lost more in 2008 ($108 billion) than they had earned in the previous thirty-seven years combined ($95 billion).[12] But they remained solvent because they had taken a relatively conservative mortgage-investing approach. They continued to support the United States home-mortgage system as distressed banks failed.

In 2008, the President signed HERA into law to protect the national economy from further losses. HERA established FHFA as an "independent agency of the Federal Government" and classified Fannie and Freddie as "regulated entit[ies]" under FHFA.[13]

B

A single Director leads FHFA.[14] He is "appointed by the President, by and with the advice and consent of the Senate."[15] The Director serves a term of five years, "unless removed before the end of such term for cause by the President."[16] The Director designates three Deputy Directors.[17] In case of a vacancy in the Director office, "the President shall designate [one of the Deputy Directors] to serve as acting Director until the return of the Director, or the appointment of a successor."[18]

---

[12] Office of Inspector General (OIG), FHFA, *Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements* 5 (Mar. 20, 2013), https://www.fhfaoig.gov/Content/Files/WPR-2013-002_2.pdf.

[13] 12 U.S.C. § 4511(a), (b).

[14] *Id.* § 4512(a).

[15] *Id.* § 4512(b)(1).

[16] *Id.* § 4512(b)(2).

[17] *Id.* § 4512(c)–(e) (providing for Deputy Director of the Division of Enterprise Regulation, Deputy Director of the Division of Federal Home Loan Bank Regulation, and Deputy Director for Housing Mission and Goals).

[18] *Id.* § 4512(f).

No. 17-20364

Other features strengthen FHFA's independence. It runs on annual assessments collected from the GSEs, not public or appropriated money.[19] It is "advise[d]" by the Federal Housing Finance Oversight Board: the Secretary of the Treasury, the Secretary of Housing and Urban Development, the Chairman of the Securities and Exchange Commission, and the FHFA Director.[20] But the Board's power is Lilliputian. It "may not exercise any executive authority, and the Director may not delegate to the Board any of the functions, powers, or duties of the Director."[21]

FHFA regulates normal GSE operations. The Director must issue regulations, guidelines, or orders necessary to oversee the GSEs and ensure their sound operations.[22] FHFA also has enforcement authority. The Director may bring charges against a GSE for unsound practices or violating the law.[23] He may issue cease-and-desist orders, require the GSE to remedy any violations, and impose penalties.[24]

C

FHFA is not just a regulator. Under 12 U.S.C. § 4617 it may serve as conservator or receiver for the GSEs. FHFA has discretion to appoint itself conservator or receiver in some cases, and receivership is mandatory in other critical insolvency situations.[25] Conservatorship and receivership are mutually exclusive: Appointing FHFA as receiver "shall immediately terminate any conservatorship established for the regulated entity under this chapter."[26]

---

[19] *Id.* § 4516.

[20] *Id.* § 4513a(a)–(c).

[21] *Id.* § 4513a(b).

[22] *Id.* § 4526(a); *see id.* § 4513.

[23] *Id.* § 4631(a)(1).

[24] *Id.* § 4631(c); *see id.* §§ 4632(e), 4635, 4636, 4641.

[25] *Id.* § 4617(a)(3) (discretionary appointment), (a)(4) (mandatory receivership).

[26] *Id.* § 4617(a)(4)(D).

No. 17-20364

D

Section 4617 next provides FHFA's general powers as conservator or receiver. In either role, FHFA is a successor to the GSE:

> The Agency shall, as conservator or receiver, and by operation of law, immediately succeed to—
> (i) all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity . . . .[27]

Similarly, FHFA in either role may operate the GSE:

> The Agency may, as conservator or receiver—
> (i) take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity;
> (ii) collect all obligations and money due the regulated entity;
> (iii) perform all functions of the regulated entity in the name of the regulated entity which are consistent with the appointment as conservator or receiver;
> (iv) preserve and conserve the assets and property of the regulated entity; and
> (v) provide by contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator or receiver.[28]

And FHFA in either role may exercise incidental powers to carry out those enumerated:

> Incidental powers
> The Agency may, as conservator or receiver—
> (i) exercise all powers and authorities specifically granted to conservators or receivers, respectively, under this section, and such incidental powers as shall be necessary to carry out such powers; and

---

[27] *Id.* § 4617(b)(2)(A).
[28] *Id.* § 4617(b)(2)(B).

8

No. 17-20364

(ii) take any action authorized by this section, which the Agency
determines is in the best interests of the regulated entity or the
Agency.[29]

FHFA in either role may also order a shareholder, director, or officer to perform
any function.[30] And in either role it may transfer or sell any GSE asset or
liability without consent.[31] FHFA in either role also benefits from an anti-
injunction provision:

Except as provided in this section or at the request of the Director,
no court may take any action to restrain or affect the exercise of
powers or functions of the Agency as a conservator or a receiver.[32]

E

Other powers depend on capacity. Section 4617 grants some powers to
FHFA as conservator only:

Powers as conservator
The Agency may, as conservator, take such action as may be—
(i) necessary to put the regulated entity in a sound and solvent
condition; and
(ii) appropriate to carry on the business of the regulated entity and
preserve and conserve the assets and property of the regulated
entity.[33]

It grants other powers to FHFA as receiver only:

Additional powers as receiver
In any case in which the Agency is acting as receiver, the Agency
shall place the regulated entity in liquidation and proceed to
realize upon the assets of the regulated entity in such manner as
the Agency deems appropriate . . . .[34]

---

[29] *Id.* § 4617(b)(2)(J).
[30] *Id.* § 4617(b)(2)(C).
[31] *Id.* § 4617(b)(2)(G).
[32] *Id.* § 4617(f).
[33] *Id.* § 4617(b)(2)(D).
[34] *Id.* § 4617(b)(2)(E).

No. 17-20364

Receivership, then, grants a power and duty to liquidate the GSE. Unsurprisingly, § 4617 next provides a regime for the receiver's orderly processing of creditor claims.

It is extensive. As receiver FHFA must publish and mail notice to creditors to present their claims.[35] It generally must allow or disallow a claim within 180 days of filing.[36] It must expedite certain secured claims with potential for irreparable injury.[37] It may also make rules for allowing and disallowing claims.[38] And it must allow proven claims.[39] Creditors may alternatively pursue their claims in U.S. district court.[40] The receivership scheme qualifies the succession provision by carving out surviving shareholder and creditor rights:

> [T]he appointment of the Agency as receiver . . . and its succession, by operation of law, to the rights, titles, powers, and privileges described in subsection (b)(2)(A) shall terminate all rights and claims that the stockholders and creditors of the regulated entity may have against the assets or charter . . . except for their right to payment, resolution, or other satisfaction of their claims, as permitted under subsections (b)(9), (c), and (e).[41]

In short, FHFA as receiver must divide the GSEs' assets between creditors and shareholders according to law.

---

[35] *Id.* § 4617(b)(3)(B)–(C).
[36] *Id.* § 4617(b)(5)(A).
[37] *Id.* § 4617(b)(8).
[38] *Id.* § 4617(b)(4).
[39] *Id.* § 4617(b)(5)(B).
[40] *Id.* § 4617(b)(6).
[41] *Id.* § 4617(b)(2)(K).

No. 17-20364

F

Congress also amended the GSEs' charters by giving Treasury temporary authority to purchase their securities.[42] In connection with any purchase, it required Treasury to make an "[e]mergency determination" that the purchase would "(i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."[43] Congress also prescribed six mandatory considerations for exercising the authority, "[t]o protect the taxpayers."[44] The temporary purchase authority terminated on December 31, 2009, except for Treasury's rights under purchases already made.[45]

II

In September 2008, FHFA appointed itself a conservator for the GSEs. The next day, Treasury and the GSEs entered Preferred Stock Purchase Agreements. Treasury made a capital commitment, capped at $100 billion per GSE, to keep them from defaulting. In return, Treasury received one million senior preferred shares in each GSE. These shares entitled Treasury to:

- a $1 billion senior liquidation preference;

- a dollar-for-dollar increase in that preference each time a GSE drew on the capital commitment;

- quarterly dividends of either an amount equal to 10% of the liquidation preference, or a 12% increase in the liquidation preference itself;

- warrants allowing Treasury to purchase up to 79.9% of common stock;

---

[42] *Id.* §§ 1455(*l*)(1) (authority as to Freddie Mac), 1719(g)(1) (authority as to Fannie Mae).

[43] *Id.* §§ 1455(*l*)(1)(B), 1719(g)(1)(B).

[44] *Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C).

[45] *Id.* §§ 1455(*l*)(4), 1719(g)(4).

- and periodic commitment fees.

The Agreements also prohibited the GSEs from declaring a dividend or making any other distribution without Treasury's consent.

Treasury and FHFA later amended the Agreements. In May 2009 they adopted the First Amendment: Treasury agreed to double its funding commitment to $200 billion per GSE. In December 2009 they adopted the Second Amendment: Treasury agreed to an increased, adjustable commitment to account for the GSEs' losses. As of August 2012, the GSEs had drawn approximately $187 billion from Treasury's funding commitment. But they lacked the cash to pay 10% dividends. So in August 2012 FHFA and Treasury adopted the Third Amendment to the Agreements.

The Third Amendment replaced the quarterly 10% dividend with variable dividends equal to the GSEs' entire net worth except a capital reserve. The Shareholders call this arrangement the "net worth sweep." The capital reserve buffer started at $3 billion. It decreased annually until it reached zero in 2018. This arrangement was a double-edged sword. The GSEs no longer struggled to make dividend payments, but they would also no longer accrue capital. Treasury also suspended the periodic commitment fees. Treasury announced that the Third Amendment would "expedite the wind down of Fannie Mae and Freddie Mac" and ensure that the GSEs "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."[46] A federal official commented privately that the

---

[46] Compl. ¶ 135 (quoting Press Release, Dep't of Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012)).

No. 17-20364

Third Amendment was designed to prevent Fannie and Freddie from recapitalizing.[47]

The net worth sweep transferred a fortune from Fannie and Freddie to Treasury. When this suit was filed, the GSEs had paid $195 billion in dividends under the net worth sweep. Under the Agreements more broadly, Treasury had disbursed $187 billion and recouped $250 billion, thanks largely to the net worth sweep.

## III

The Shareholders sued FHFA, its Director, Treasury, and its Secretary (the Agencies). They assert four causes of action, three statutory and one constitutional:

- In Count I, they allege the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(C), (D), affords relief because FHFA exceeded its statutory conservator authority under 12 U.S.C. § 4617(b)(2)(D).

- In Count II, they allege the APA, 5 U.S.C. § 706(2)(C), (D), affords relief because Treasury exceeded its securities-purchase authority under 12 U.S.C. §§ 1455(*l*), 1719(g). Specifically, they allege that Treasury purchased securities after the sunset period, failed to make the required "[e]mergency determination[s]," and disregarded statutory "[c]onsiderations."

- In Count III, they allege the APA, 5 U.S.C. § 706(2)(A), affords relief because Treasury's adoption of the net worth sweep was arbitrary and capricious.

- In Count IV, they allege FHFA violates Article II, §§ 1 and 3 of the Constitution because, among other things, it is headed by a single Director removable only for cause.

---

[47] *Id.* ¶ 107.

No. 17-20364

The Shareholders seek a declaration that the net worth sweep violates HERA and is arbitrary and capricious; a declaration that FHFA's structure violates the separation of powers; an injunction against Treasury to return net-worth-sweep dividends (or treat them as paying down the liquidation preference); vacatur of the net worth sweep; and an injunction against further implementation of the net worth sweep.

The Agencies each moved to dismiss all claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). And the Shareholders and FHFA both moved for summary judgment on Count IV, the constitutional claim. The district court granted the Agencies' motions to dismiss Counts I–III based on the anti-injunction provision. And it granted summary judgment to FHFA on the merits of Count IV. The Shareholders appealed.

A panel of this court affirmed as to the statutory claims and reversed as to the constitutional claim.[48] We then granted rehearing en banc, vacating the panel decision.[49] Before rehearing en banc, both FHFA and Treasury admitted the merits of Count IV: FHFA's structure violates the separation of powers. But, several months after rehearing en banc, FHFA reversed its position again. It now contends that FHFA's structure is constitutional. Treasury stands by its contrary position. And FHFA and Treasury maintain that for a number of other reasons the Shareholders are not entitled to relief on Count IV.

IV

The rules governing jurisdiction and our standard of review are familiar.

*Jurisdiction*. The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

---

[48] *Collins v. Mnuchin*, 896 F.3d 640 (5th Cir. 2018) (per curiam).
[49] *Collins v. Mnuchin*, 908 F.3d 151 (5th Cir. 2018); 5TH CIR. R. 41.3.

No. 17-20364

*Standard of review.* "We review de novo a district court's rulings on a motion to dismiss and a motion for summary judgment, applying the same standard as the district court."[50] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[51] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[52] Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[53] We may consider a fact undisputed "[i]f a party . . . fails to properly address another party's assertion of fact."[54]

V

We begin with Counts I–III, the Shareholders' statutory claims. Before reaching the merits, we must decide whether they are justiciable under HERA's anti-injunction provision and succession provision.

A

HERA's anti-injunction provision limits court action against FHFA's conservator or receiver powers:

> Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver.[55]

To interpret this provision, we consult its plain meaning and its past judicial interpretations (including in predecessor statutes).

---

[50] *TOTAL Gas & Power N. Am., Inc. v. FERC*, 859 F.3d 325, 332 (5th Cir. 2017).
[51] *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[52] *Id.*
[53] FED. R. CIV. P. 56(a).
[54] FED. R. CIV. P. 56(e).
[55] 12 U.S.C. § 4617(f).

No. 17-20364

The Supreme Court instructs that plain meaning comes first: "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."[56] Under the anti-injunction provision's plain meaning, we may not grant any relief that interferes with—"restrain[s] or affect[s]"— FHFA's conservator powers. Logically, then, we may still grant relief against action taken outside those powers. The anti-injunction provision deflects claims about how the conservator used its powers, not claims it exceeded the powers granted. It distinguishes improperly exercising a power (not restrainable) from exercising one that was never authorized (restrainable).

Past judicial interpretations confirm this view. Congress borrowed much of HERA's text from the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).[57] FIRREA authorizes the Federal Deposit Insurance Corporation (FDIC) to act as conservator or receiver for distressed banks.[58] FIRREA's vintage conservator and receiver scheme, including the anti-injunction provision, is materially similar to HERA's.[59] So is one of FIRREA's own predecessors, the Financial Institutions Supervisory Act of 1966 (FISA), which governed conservatorship and receivership by the Federal

---

[56] *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)).

[57] Pub. L. No. 101-73, 103 Stat. 183 (codified at 12 U.S.C. § 1811 *et seq.*); *see* Michael Krimminger & Mark A. Calabria, *The Conservatorships of Fannie Mae and Freddie Mac: Actions Violate HERA and Established Insolvency Principles* 19 (Cato Inst., Working Paper No. 26, 2015) ("Staff quite literally 'marked-up' Sections 11 and 13 of the [Federal Deposit Insurance Act (FDIA), a FIRREA predecessor] as the base text for HERA.").

[58] 12 U.S.C. § 1821(c).

[59] *Compare* 12 U.S.C. § 4617(f) (HERA), *with id.* § 1821(j) (FIRREA) ("Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver.").

No. 17-20364

Savings and Loan Insurance Corporation (FSLIC).[60] If FIRREA is HERA's parent, FISA is a grandparent.

The Supreme Court tells us that those provisions' judicial interpretations guide our analysis of HERA. "[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."[61] "And when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.'"[62]

The Supreme Court interpreted FISA's anti-injunction provision in *Coit*.[63] It held the provision did not strip federal jurisdiction over claims in a FSLIC receivership.[64] Rather, it "simply prohibit[ed] courts from restraining or affecting . . . those receivership 'powers and functions' that have been granted by other statutory sources."[65] So the anti-injunction provision didn't affect whether a particular power existed in the first place.[66]

We have applied *Coit* to FIRREA's anti-injunction provision. In *Onion* we held that the provision prevented a federal court from stopping a

---

[60] Pub. L. No. 89-695, 80 Stat. 1028, 1033 ("Except as otherwise provided in this subsection, no court may take any action for or toward the removal of any conservator or receiver, or, except at the instance of the Board, restrain or affect the exercise of powers or functions of a conservator or receiver.").

[61] *Lorillard v. Pons*, 434 U.S. 575, 581 (1978).

[62] *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (ellipsis omitted) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)).

[63] *Coit Indep. Joint Venture v. FSLIC*, 489 U.S. 561, 574–77 (1989) (interpreting FISA, 80 Stat. 1033).

[64] *Id.*

[65] *Id.* at 574.

[66] *Id.* ("[T]his language does not add adjudication of creditor claims to FSLIC's receivership powers.").

17

conservator's foreclosure and sale.[67] In *Ward*, relying on *Onion*, we held that the anti-injunction provision stopped a federal court from rescinding a receiver's sale.[68] We elaborated that there is a "difference between the exercise of a function or power that is clearly outside the statutory authority of the RTC on the one hand, and improperly or even unlawfully exercising a function or power that is clearly authorized by statute on the other."[69]

*Ward* is the anti-injunction provision's strongest expression. We declined to review even whether the receiver breached its express statutory duty to maximize the property's value.[70] But we did so based on the understanding that, even if the receiver sold the property for inadequate value, it had "improperly or unlawfully exercised an authorized power or function," not "engage[d] in an activity outside its statutory powers."[71] *Ward*'s facts are different from this case. In *Ward*, selling low instead of high was an improper use of the receiver's power to liquidate assets. But here, FHFA as conservator essentially liquidated assets without ever being appointed receiver. Improperly exercising a power is not restrainable, but exercising one beyond statutory authority is.

Other circuits follow the same interpretation. Even our sister courts that rejected claims like Counts I–III acknowledge the same rule: "Section 4617(f) will not protect the Agency if it acts either *ultra vires* or in some third capacity"

---

[67] *281-300 Joint Venture v. Onion*, 938 F.2d 35, 39 (5th Cir. 1991) (citing *Coit*, 489 U.S. at 574).

[68] *Ward v. RTC*, 996 F.2d 99, 103 (5th Cir. 1993).

[69] *Id.*; *see also Carney v. RTC*, 19 F.3d 950, 956 (5th Cir. 1994) (holding that FIRREA anti-injunction provision deprived court of jurisdiction because RTC's action was within statutory powers).

[70] *Ward*, 996 F.2d at 103.

[71] *Id.*

No. 17-20364

besides conservator or receiver.[72] So have circuits deciding unrelated cases against FHFA. To quote the Ninth Circuit, "the anti-judicial review provision is inapplicable when FHFA acts beyond the scope of its conservator power."[73] And the Eleventh Circuit holds that "[t]he FHFA cannot evade judicial scrutiny by merely labeling its actions with a conservator stamp."[74]

The provision's plain meaning, FIRREA precedent, and HERA precedent show that we may grant relief if FHFA exceeded its statutory powers. The Agencies primarily contend that the Third Amendment falls within the conservatorship powers, 12 U.S.C. § 4617(b)(2). As we explain below, that is incorrect, at least at the pleading stage. But first, we address the Agencies' arguments from disconnected provisions.

The Agencies suggest Treasury's temporary purchase authority authorized the Third Amendment.[75] Congress authorized Treasury to "purchase any obligations and other securities issued by the [GSEs] . . . on such terms and conditions . . . and in such amounts as the Secretary may determine."[76] It also authorized Treasury "at any time[] [to] exercise any rights received in connection with such purchases."[77]

---

[72] *Roberts v. FHFA*, 889 F.3d 397, 402 (7th Cir. 2018); *see Jacobs v. FHFA*, 908 F.3d 884, 889 (3rd Cir. 2018) ("Section 4617(f) bars claims when 1) the government acts as a conservator, 2) it does not exceed its statutory authority, and 3) the remedy sought would affect the exercise of that authority."); *Saxton v. FHFA*, 901 F.3d 954, 957 (8th Cir. 2018) ("[T]his provision bars only equitable relief, and only does so if the challenged action is within the powers given FHFA by HERA."); *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 606 (D.C. Cir. 2017) ("The plain statutory text draws a sharp line in the sand against litigative interference . . . with FHFA's statutorily permitted actions as conservator or receiver.").

[73] *County of Sonoma v. FHFA*, 710 F.3d 987, 992 (9th Cir. 2013).

[74] *Leon County v. FHFA*, 700 F.3d 1273, 1278 (11th Cir. 2012).

[75] *See* 12 U.S.C. §§ 1455(*l*)(1)(A), 1719(g)(1)(A).

[76] *Id.* §§ 1455(*l*)(1)(A), 1719(g)(1)(A).

[77] *Id.* §§ 1455(*l*)(2)(A), 1719(g)(2)(A).

No. 17-20364

But these provisions cannot sustain the Agencies' argument. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."[78] Authorizing Treasury to enter an open-ended category of transactions does not override the elaborate powers scheme in FHFA's enabling statute.[79]

The Agencies also contend that Congress ratified the Third Amendment in the Consolidated Appropriations Act of 2016.[80] This act restricted Treasury from disposing of certain shares, specifically including its rights under the Third Amendment, until 2018.[81] The statute's most favorable reading for Treasury is that, in directing Treasury to retain its Third Amendment interest, Congress recognized or enacted that interest's lawfulness.[82]

The Appropriations Act does not support that reading. In directing Treasury to retain preferred shares, it speaks to future conduct, not past action. The Supreme Court has "recognized congressional acquiescence to administrative interpretations of a statute in some situations, [but] ha[s] done so with extreme care."[83] Treasury faces "a difficult task in overcoming the plain

---

[78] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

[79] *See id.*

[80] Pub. L. No. 114-113, § 702, 129 Stat. 2242, 3024–25 (2015).

[81] *Id.*

[82] The statute also included a "Sense of Congress" provision:

It is the Sense of Congress that Congress should pass and the President should sign into law legislation determining the future of Fannie Mae and Freddie Mac, and that notwithstanding the expiration of subsection (b), the Secretary should not sell, transfer, relinquish, liquidate, divest, or otherwise dispose of any outstanding shares of senior preferred stock acquired pursuant to the Senior Preferred Stock Purchase Agreement until such legislation is enacted.

*Id.* § 702(c).

[83] *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001).

text and import of [HERA]" with a later enactment.[84] Here, the Appropriations Act only established a going-forward requirement to maintain the status quo. That is not enough to show that the Agencies' past actions accorded with HERA. The Agencies' conservatorship theory looms large over markets and federal conservatorships, so we presume Congress did not stealthily ratify it in an appropriations rider—hiding an elephant in a mousehole.[85]

It follows that whether the anti-injunction provision bars relief on Counts I–III depends entirely on whether the net worth sweep exceeded FHFA's statutory conservatorship powers.[86]

B

The Agencies next invoke HERA's succession provision as a defense. When appointed conservator, FHFA succeeds to certain shareholder rights:

> The Agency shall, as conservator or receiver, and by operation of law, immediately succeed to . . . all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity . . . .[87]

The Agencies say that FHFA succeeded to the Shareholders' right to bring derivative suits, and Counts I–III are derivative. Generally speaking, "[t]he derivative form of action permits an individual shareholder to bring 'suit to enforce a *corporate* cause of action against officers, directors, and third parties,'" whereas a direct cause of action belongs to the shareholder himself.[88]

---

[84] *Id.* at 170.

[85] *See Whitman*, 531 U.S. at 468 ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

[86] *See, e.g.*, *Saxton*, 901 F.3d at 959 (concluding that anti-injunction analysis is similar for net-worth-sweep claims against both FHFA and Treasury).

[87] 12 U.S.C. § 4617(b)(2)(A).

[88] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)).

Other circuits have held that FHFA succeeded to derivative claims but not direct.[89] They have textual support: The succession provision transfers shareholders' rights "with respect to the regulated entity and [its] assets."[90] Simultaneously, under a separate provision, shareholders and creditors retain "their right to payment, resolution, or other satisfaction of their claims" in the receivership claim-processing scheme.[91] This means some claims survive the succession provision. And it makes sense to define those claims as direct ones. The ordinary meaning of claims "with respect to" a GSE and its assets does not include a shareholder's personal claims. And FIRREA decisions took a similar view.[92]

To decide whether Counts I–III are direct or derivative, we begin with the cause of action. Counts I–III assert rights under the APA. Under 5 U.S.C. § 702, "[a] person suffering legal wrong . . . or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review." And under 5 U.S.C. § 706, "[t]he reviewing court shall . . . hold unlawful and set aside agency action" that is arbitrary and capricious, exceeds statutory authority, or is otherwise unlawful.

The APA cause of action is broad. The "Administrative Procedure Act . . . embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'"[93] "[J]udicial review of a final agency

---

[89] *See Roberts*, 889 F.3d at 408; *Perry Capital*, 864 F.3d at 624.

[90] 12 U.S.C. § 4617(b)(2)(A).

[91] *Id.* § 4617(b)(2)(K)(i).

[92] *Roberts*, 889 F.3d at 408 (citing *Levin v. Miller*, 763 F.3d 667, 669 (7th Cir. 2014); *Courtney v. Halleran*, 485 F.3d 942, 950 (7th Cir. 2007)).

[93] *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702), *abrogated by statute in other part as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977).

action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."[94] An APA claim must be justiciable under Article III, but otherwise who may sue is in Congress's hands.[95] Congress has granted an APA claim to any party that alleges "the challenged action had caused them 'injury in fact,' and . . . the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated."[96]

"Whether a plaintiff comes within the zone of interests . . . requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."[97] The Supreme Court once considered the zone of interests a matter of "prudential standing," but now calls it one of statutory interpretation.[98] The Court "ha[s] said, in the APA context that the test is not 'especially demanding.'"[99] It has "conspicuously included the word 'arguably' in the test

---

[94] *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) (quoting *Abbott Labs.*, 387 U.S. at 140); *see Barlow v. Collins*, 397 U.S. 159, 166 (1970) ("[P]reclusion of judicial review of administrative action adjudicating private rights is not lightly to be inferred. Indeed, judicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated." (citations omitted)).

[95] *Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972).

[96] *Id.* at 733 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)); *see Bennett v. Spear*, 520 U.S. 154, 175 (1997) ("In determining whether the petitioners have standing under the zone-of-interests test to bring their APA claims, we look . . . to the substantive provisions of the [Endangered Species Act of 1973], the alleged violations of which serve as the gravamen of the complaint.").

[97] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (internal quotation marks omitted).

[98] *Id.* (applying zone-of-interests test and disapproving "prudential standing" label); *see Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017) ("In *Lexmark*, we said that the label 'prudential standing' was misleading, for the requirement at issue is in reality tied to a particular statute.").

[99] *Id.* at 130 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)).

to indicate that the benefit of any doubt goes to the plaintiff."[100] "[T]he test 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue."[101] The zone of interests "is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies."[102]

Count I, to the extent it has merit, is a direct claim. The Shareholders suffered injury in fact—they were excluded from the GSEs' profits. And they are within the zone of interests HERA protects. Count I alleges that FHFA violated 12 U.S.C. § 4617(b)(2)(D)—the grant of conservator powers. The Shareholders' economic value is "arguably within the zone of interests" for this provision.[103] It is axiomatic that shareholders are the residual claimants of a firm's value.[104] They are among the first beneficiaries of the "sound and solvent condition" that a conservator is empowered to pursue.[105] And they ordinarily have a claim on the "assets and property" that a conservator is empowered to "preserve and conserve."[106] For example, in *James Madison*, the D.C. Circuit

---

[100] *Id.* (quoting *Patchak*, 567 U.S. at 225).

[101] *Id.* (quoting *Patchak*, 567 U.S. at 225).

[102] *Bennett*, 520 U.S. at 175–76.

[103] *City of Miami*, 137 S. Ct. at 1303.

[104] *Cf. FDIC v. Morley*, 867 F.2d 1381, 1391 (11th Cir. 1989) (stating that "Congress enacted the [Federal Deposit Insurance Act, a FIRREA precedessor] to protect depositors and bank shareholders").

[105] 12 U.S.C. § 4617(b)(2)(D); *see* Compl. ¶¶ 35–37, 44, 109, 114, 142–43 (alleging Shareholders' holdings, accompanying rights, and effect of net worth sweep).

[106] 12 U.S.C. § 4617(b)(2)(D); *see* Compl. ¶ 114 ("The effect of the Net Worth Sweep is . . . to immediately nullify the rights of private shareholders to any return *of* their principal or any return *on* their principal (i.e., in the form of dividends).").

held a bank shareholder could challenge the FDIC's appointment as the bank's receiver under FIRREA.[107]

Plus, HERA elsewhere states that the succession provision does not extinguish the Shareholders' right to pursue their claims in receivership.[108] This matters because Count I essentially alleges that an improper conservatorship preempted rights that could have been redeemed in receivership.[109] Because the Shareholders are within the zone of interests protected by HERA's enumeration of conservator powers, they have a direct claim.

And the prudential shareholder-standing rule does not change this analysis. The rule is "a strand of the standing doctrine that prohibits litigants from suing to enforce the rights of third parties."[110] But for APA claims, "Congress itself has pared back traditional prudential limitations."[111] The APA does not abolish the shareholder-standing doctrine. But it limits it in some cases. *James Madison* is one example, because the court held it had jurisdiction to review the shareholder's APA action against appointment of a receiver.[112] The Supreme Court decisions *City of Miami* and *Lexmark* also support this point: For very broad statutory rights like the APA, an injury in fact and

---

[107] *James Madison Ltd. ex rel Hecht v. Ludwig*, 82 F.3d 1085, 1094 (D.C. Cir. 1996).

[108] 12 U.S.C. § 4617(b)(2)(K)(i).

[109] *See, e.g.*, Compl. ¶¶ 7 ("Indeed, a receivership that liquidates the Companies would have more economic value to the private shareholders than the conservatorship as it was structured and operated in practice."), 56 (alleging no regulator before has imposed conservatorship on healthy company while "simultaneously avoiding the organized claims process of a receivership").

[110] *Nocula v. UGS Corp.*, 520 F.3d 719, 726 (7th Cir. 2008).

[111] *FAIC Secs., Inc. v. United States*, 768 F.2d 352, 357 (D.C. Cir. 1985) (Scalia, J.).

[112] 82 F.3d at 1094.

inclusion in the zone of interests can add up to a right of action, even if prudential standing limits would have blocked it.[113] That is the case here.

In so holding, we do not say that there is no direct–derivative distinction for APA claims. Nor is it true that any shareholder may obtain review of agency action affecting his holdings. In *Thompson v. North American Stainless, LP*, the Supreme Court rejected the "absurd" proposition that shareholders could sue under Title VII employment protections.[114] Shareholders are not within Title VII's zone of interests because "the purpose of Title VII is to protect employees from their employers' unlawful actions."[115] But a corporate reorganization statute is a different animal. Shareholders may be within its zone of interests, and here they are.[116]

Counts II and III, however, are not within the asserted statutes' zone of interests. In Count II the Shareholders allege that Treasury violated 12 U.S.C. §§ 1455(*l*), 1719(g), which granted it authority to purchase securities in the GSEs. They say the net worth sweep effectively purchased securities after these provisions' 2009 sunset and otherwise exceeded the purchase

---

[113] *See City of Miami*, 137 S. Ct. at 1302 ("This Court has also referred to a plaintiff's need to satisfy 'prudential' or 'statutory' standing requirements. In *Lexmark*, we said that the label 'prudential standing' was misleading, for the requirement at issue is in reality tied to a particular statute. The question is whether the statute grants the plaintiff the cause of action that he asserts." (citations omitted)); *Lexmark*, 572 U.S. at 128 ("Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." (citation omitted)).

[114] 562 U.S. 170, 176–77 (2011).

[115] *Id.* at 178.

[116] *See James Madison*, 82 F.3d at 1092–94 ("[R]equiring stockholders of wrongfully seized national banks to wait on the sidelines while the FDIC liquidates their institutions conflicts with Congress's apparent desire . . . that seized institutions act quickly in challenging the FDIC's appointment."); *Morley*, 867 F.2d at 1391 ("Congress enacted the FDIA [a FIRREA predecessor] to protect depositors and bank shareholders . . . .").

authority.[117] In Count III they allege that Treasury acted arbitrarily and capriciously under those same sections because it never made the requisite "[e]mergency determination."[118]

Congress granted this purchase authority to protect markets, consumers, and taxpayers, not GSE stakeholders. The emergency determination asks whether a purchase will stabilize markets, prevent disruptions in mortgage finance, and protect taxpayers.[119] And the statutes' mandatory "[c]onsiderations" are likewise public-oriented: Treasury must consider the GSEs' condition, and any transaction's structure, "[t]o protect the taxpayers."[120] So we agree with the district court, though for a different reason, that Counts II and III must be dismissed.

## VI

We now consider Count I's substantive allegation that the net worth sweep exceeded FHFA's conservator powers. Like any federal agency, FHFA "literally has no power to act . . . unless and until Congress confers power upon it."[121] This principle is enshrined in statute: "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations . . . ."[122] It is recognized in prominent Supreme Court decisions and implicit in countless

---

[117] *See* 12 U.S.C. §§ 1455(*l*)(4) (providing that purchase authority "shall expire December 31, 2009"), 1719(g)(4) (same).

[118] *Id.* §§ 1455(*l*)(1)(B) ("In connection with any use of this authority, the Secretary must determine that such actions are necessary to—(i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."), 1719(g)(1)(B) (same).

[119] *Id.* §§ 1455(*l*)(1)(B), 1719(g)(1)(B).

[120] *Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C).

[121] *New York v. FERC*, 535 U.S. at 18 (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 374).

[122] 5 U.S.C. § 706.

others.[123] The warning that "[i]f we are to continue a government of limited powers, these agencies must themselves be regulated" remains as fresh as ever.[124]

## A

To define FHFA's statutory authority, we "follow the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context."[125] Emphasis on isolated provisions at the expense of other, more applicable ones is "hyperliteral and contrary to common sense."[126] As Learned Hand explained, "[w]ords are not pebbles in alien juxtaposition; they have only a communal existence."[127] Our analysis proceeds in three parts: HERA's plain meaning, its past judicial interpretations (including FIRREA precedent), and insight from common-law conservatorship.

## 1

Under HERA's plain meaning, FHFA as conservator has limited, enumerated powers. To begin with, conservator and receiver are distinct and mutually exclusive roles. HERA says FHFA may "be appointed as conservator *or* receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."[128] In ordinary use, the word "or" is "almost always

---

[123] *See, e.g.*, *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 134–35 (1990) (holding that agency "does not have the power to adopt a policy that directly conflicts with its governing statute"); *La. Pub. Serv. Comm'n*, 476 U.S. at 374 (holding that "a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority").

[124] Felix Frankfurter, *The Growth of American Administrative Law*, 37 HARV. L. REV. 638, 639 (1924) (book review) (quoting Elihu Root, *Address of the President*, 41 AM. BAR ASS'N REP. 356–69 (1916)).

[125] *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citation omitted).

[126] *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

[127] *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (quoted in *King*, 502 U.S. at 221).

[128] 12 U.S.C. § 4617(a)(2) (emphasis added).

disjunctive, that is, the words it connects are to be given separate meanings."[129] So FHFA may not occupy both roles simultaneously. To the same point, "[t]he appointment of the Agency as receiver . . . shall immediately terminate any conservatorship."[130] Similarly, the incidental powers provision authorizes FHFA to "exercise all powers and authorities specifically granted to conservators or receivers, *respectively*, under this section, and such incidental powers as shall be necessary to carry out such powers."[131] In short, the FHFA Director may appoint the agency as either conservator or receiver, but once he does so, FHFA's powers depend on the role.

Some powers do overlap. HERA grants general powers to FHFA as either conservator or receiver. In either capacity, FHFA is a successor to the GSE.[132] It succeeds to the GSE's and its stakeholders' "rights, titles, powers, and privileges . . . with respect to the regulated entity and [its] assets."[133] Similarly, FHFA in either capacity has power to operate the GSE.[134] This includes taking over its assets, operating its business, collecting obligations, performing its functions, preserving and conserving its assets and property, and entering contracts.[135] The list goes on: In either role FHFA may transfer assets or

---

[129] *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)).

[130] 12 U.S.C. § 4617(a)(4)(D).

[131] *Id.* § 4617(b)(2)(J) (emphasis added).

[132] *Id.* § 4617(b)(2)(A).

[133] *Id.* § 4617(b)(2)(A)(i).

[134] *Id.* § 4617(b)(2)(B).

[135] *Id.*

liabilities[136]; cause other stakeholders to perform functions[137]; pay obligations[138]; issue subpoenas[139]; and exercise incidental powers.[140]

But that list has an end. Other powers depend on which role FHFA occupies. The statute enumerates FHFA's separate "[p]owers as conservator":

> The Agency may, as conservator, take such action as may be—(i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.[141]

Then it enumerates "[a]dditional powers as receiver":

> "In any case in which the Agency is acting as receiver, the Agency shall place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity in such manner as the Agency deems appropriate, including through the sale of assets . . . ."[142]

The receiver powers also include organizing a successor enterprise[143] and administering a detailed claim-processing scheme.[144]

The receiver powers stand in contrast to the conservator powers. As receiver, FHFA gains the power to liquidate the GSE and realize on its assets.[145] It also gains the power to notice, review, and determine creditors' claims.[146] A conservator does not have these powers. If it did, a conservator

---

[136] *Id.* § 4617(b)(2)(G).
[137] *Id.* § 4617(b)(2)(C).
[138] *Id.* § 4617(b)(2)(H).
[139] *Id.* § 4617(b)(2)(I).
[140] *Id.* § 4617(b)(2)(J).
[141] *Id.* § 4617(b)(2)(D).
[142] *Id.* § 4617(b)(2)(E).
[143] *Id.* § 4617(b)(2)(F).
[144] *Id.* § 4617(b)(3), (b)(4), (b)(5), (b)(7), (b)(8), (b)(9).
[145] *Id.* § 4617(b)(2)(E).
[146] *Id.* § 4617(b)(3), (b)(4), (b)(5), (b)(7), (b)(8), (b)(9).

could liquidate the GSE's assets without following HERA's detailed claim-processing scheme.

The Agencies contend that the general powers to "operate the regulated entity" and "conduct all [its] business,"[147] or "transfer or sell any asset or liability of the regulated entity in default,"[148] authorize the net worth sweep. But if read so broadly, these provisions would obliterate the receivership claim-processing duties. If a conservator or receiver may enter *any* transaction as part of "operat[ing]" the GSE and "conduct[ing]" its business,[149] there is no bar to circumventing HERA's creditor and shareholder protections.

That would raze the receiver's duties to notice and adjudicate claims.[150] It would also be inconsistent with creditors' and shareholders' right to have their claims paid in receivership.[151] So it cannot be a correct reading. "In construing a statute we are obliged to give effect, if possible, to every word Congress used."[152] And "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."[153]

Rather than give the general powers their broadest possible meaning, we give them a meaning consistent with the separate conservator and receiver powers. A coherent interpretation of these provisions is not just reasonable, it is mandatory. In *RadLAX*, the Supreme Court held that when "a general authorization and a more limited, specific authorization exist side-by-side" in

---

[147] *Id.* § 4617(b)(2)(B)(i).

[148] *Id.* § 4617(b)(2)(G).

[149] *Id.* § 4617(b)(2)(B)(i).

[150] *Id.* § 4617(b)(3), (b)(4), (b)(5), (b)(7), (b)(8), (b)(9).

[151] *Id.* § 4617(b)(2)(K)(i).

[152] *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *see* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 176 (2012).

[153] *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

the same statute, "the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment."[154] In this situation "[t]he general/specific canon . . . avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one."[155] Other Supreme Court authority similarly warns against applying a general provision at the expense of more specific ones.[156]

Applying this to HERA, § 4617(b)(2)(D) enumerates the conservator's specific powers to "put the regulated entity in a sound and solvent condition," "carry on [its] business," and "preserve and conserve" its assets. The shared conservator-receiver powers are more general and would swallow the rest of the statute if interpreted broadly. So the more "particular enactment must be operative."[157] "[M]ay means may" and "'may' is, of course, 'permissive rather than obligatory.'"[158] But here "may" is a grant of power that enables FHFA to act. FHFA as conservator may not exercise a power beyond the ones granted.[159]

The incidental-powers provision does not change this. It gives FHFA other powers "necessary to carry out" its enumerated ones.[160] We doubt that Congress "in fashioning this intricate . . . machinery, would thus hang one of

---

[154] *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012) (quoting *United States v. Chase*, 135 U.S. 255, 260 (1890)).

[155] *Id.* at 645.

[156] *See Bloate v. United States*, 559 U.S. 196, 207 (2010) ("[G]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932))).

[157] *RadLAX*, 566 U.S. at 646 (quoting *Chase*, 135 U.S. at 260).

[158] *Perry Capital*, 864 F.3d at 607 (first quoting *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 608 (D.C. Cir. 2016); then quoting *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 63 (D.C. Cir. 2010)).

[159] *E.g.*, *La. Pub. Serv. Comm'n*, 476 U.S. at 374 ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

[160] 12 U.S.C. § 4617(b)(2)(J).

the main gears on the tail pipe."[161] Including near-unlimited conservatorship powers in this provision would swallow a large chunk of HERA. And incidental powers are those "necessary to carry out" the powers granted to "conservators or receivers, respectively."[162] This links incidental powers to enumerated ones and recognizes the conservator-receiver distinction. In short, any exercise of an incidental power must serve an enumerated power.[163] Beyond limited powers to "preserve and conserve" the GSEs' assets and property, FHFA would lack any intelligible principle to guide its discretion as conservator. This would permit essentially any action that could be characterized as "reorganizing" the GSEs and would eviscerate many pages of 12 U.S.C. § 4617.

The best-interests clause is also consistent with this reading. That clause, within the incidental-powers provision, authorizes FHFA to "take any action authorized by this section, which the Agency determines is in the best interests of the regulated entity *or the Agency*."[164] Permitting the conservator to act in its own interest may appear to depart from the traditional view of a conservator as fiduciary. But the best-interests clause modifies FHFA's authority "as conservator or receiver,"[165] and it only affects actions that are otherwise "authorized by this section."[166] So FHFA may pursue its own interests only within the conservator's enumerated powers. It may not, for example, wind down a GSE and jettison receivership protections all in its own best interests. That would not be "authorized by this section." Instead, this

---

[161] *Brannan v. Stark*, 342 U.S. 451, 463 (1952).

[162] 12 U.S.C. § 4617(b)(2)(J)(i).

[163] *Cf. RadLAX*, 566 U.S. at 645 (holding that general authority should not be interpreted to make specific authority superfluous).

[164] 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added).

[165] *Id.* § 4617(b)(2)(J).

[166] *Id.* § 4617(b)(2)(J)(ii).

clause is a modest addition to traditional conservatorship powers. It may permit related-party transactions that would otherwise be inconsistent with fiduciary duties.[167]

2

FIRREA decisions also demonstrate the conservator's limited, enumerated powers.[168] FIRREA's conservator-powers provision is materially identical to HERA's.[169] In *McAllister* we interpreted that provision to "state[] explicitly that a conservator only has the power to take actions necessary to restore a financially troubled institution to solvency."[170] We are in good company—the Fourth, Eighth, Ninth, Eleventh, and D.C. Circuits have articulated similar views.[171] Under FIRREA, a conservator has power to steward the bank's assets, not to make every conceivable use of them.

---

[167] *See Perry Capital*, 864 F.3d at 643 (Brown, J., dissenting in part).

[168] *Cf. Merrill Lynch*, 547 U.S. at 85 (stating that incorporation of language from existing statute generally incorporates its judicial interpretations as well); *Lorillard*, 434 U.S. at 581 ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change . . . .").

[169] *Compare* 12 U.S.C. § 4617(b)(2)(D) (HERA), *with id.* § 1821(d)(2)(D) (FIRREA).

[170] 201 F.3d 570, 579 (5th Cir. 2000).

[171] *See Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 922 (4th Cir. 1996) ("[A] conservator's function is to restore the bank's solvency and preserve its assets."); *James Madison*, 82 F.3d at 1090 ("The principal difference between a conservator and receiver is that a conservator may operate and dispose of a bank as a going concern, while a receiver has the power to liquidate and wind up the affairs of an institution."); *Del E. Webb McQueen Dev. Corp. v. RTC*, 69 F.3d 355, 361 (9th Cir. 1995) ("The RTC, as conservator, operates an institution with the hope that it might someday be rehabilitated. The RTC, as receiver, liquidates an institution and distributes its proceeds to creditors according to the priority rules set out in the regulations."); *RTC v. United Tr. Fund, Inc.*, 57 F.3d 1025, 1033 (11th Cir. 1995) ("The conservator's mission is to conserve assets which often involves continuing an ongoing business. The receiver's mission is to shut a business down and sell off its assets."); *RTC v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1450 (8th Cir. 1992) ("Had Congress intended RTC's status as a conservator or a receiver to be mere artifice, it would have granted all duties, rights, and powers to the Corporation.").

No. 17-20364

3

The common-law meaning of "conservator" also shows it has limited powers. The Supreme Court recognizes a "settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses."[172] And "absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."[173]

There is no shortage of authority for traditional conservatorship. Well before HERA, or even FIRREA, the Supreme Court recognized that a conservator has limited powers and must conserve the ward's property.[174] Under the Uniform Probate Code, a "conservator" is a fiduciary held to the same standard of care as a trustee.[175] And according to the Congressional Research Service, "[a] conservator is appointed to operate the institution, conserve its resources, and restore it to viability."[176] Black's Law Dictionary defines "conservator" as "[a] guardian, protector, or preserver . . . the modern equivalent of the common-law *guardian*," and it defines "managing

---

[172] *United States v. Castleman*, 572 U.S. 157, 162 (2014) (quoting *Sekhar v. United States*, 570 U.S. 729, 732 (2013)).

[173] *Morissette v. United States*, 342 U.S. 246, 263 (1952); *see Bond v. United States*, 572 U.S. 844, 861 (2014) ("In settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition.").

[174] *See Deputy v. du Pont*, 308 U.S. 488, 496 (1940) (holding that purchasing stock for executive incentives is not an "expense which a conservator of an estate . . . would ordinarily incur"); *United States v. Chem. Found.*, 272 U.S. 1, 10–11 (1926) (holding that enemy-property custodian "was a mere conservator and was authorized to sell only to prevent waste").

[175] UNIF. PROB. CODE § 5-418(a).

[176] DAVID H. CARPENTER & M. MAUREEN MURPHY, CONG. RES. SERV., FINANCIAL INSTITUTION INSOLVENCY: FEDERAL AUTHORITY OVER FANNIE MAE, FREDDIE MAC, AND DEPOSITORY INSTITUTIONS 5 (2008), https://digital.library.unt.edu/ark:/67531/metadc 795484/m1/1/high_res_d/RL34657_2008Sep10.pdf.

conservator" as "[a] person appointed by a court to manage the estate or affairs of someone who is legally incapable of doing so."[177]

Tethering the conservator's powers to traditional principles of insolvency is both sound and indispensable. FHFA's present Director has explained that "[a] market economy depends upon predictable rules to govern competition. These rules must include . . . predictable and fair standards to allocate losses and rehabilitate or liquidate a company when it cannot pay its debts."[178] Considering this need for continuity, HERA's conservator powers must be interpreted in light of both FIRREA decisions and traditional conservatorship.[179] These authorities "reflect a fundamental difference between the missions of a conservator, which seeks to reorganize, and a receiver, which seeks to liquidate."[180]

Congress built FIRREA, and later HERA, on this common-law understanding. Until recently, FHFA agreed. It told Congress in 2010 that "[t]he purpose of conservatorship is to preserve and conserve each company's assets and property and to put the companies in a sound and solvent condition."[181] In 2011, it had a "statutory *mission* to restore soundness and solvency to insolvent regulated entities and to preserve and conserve their assets and property."[182] In a 2012 regulation, it said "FHFA's duties as

---

[177] *Conservator*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[178] Michael Krimminger & Mark A. Calabria, *The Conservatorships of Fannie Mae and Freddie Mac: Actions Violate HERA and Established Insolvency Principles* 8 (Cato Inst., Working Paper No. 26, 2015).

[179] *See id.* at 26–27.

[180] *Id.* at 42.

[181] Fed. Hous. Fin. Agency, Report to Congress: 2009, at i (May 25, 2010), https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/2009_AnnualReportToCongress_508.pdf.

[182] Conservatorship and Receivership, 76 Fed. Reg. 35724, 35726 (June 20, 2011) (emphasis added).

conservator *require* the conservation and preservation of the Enterprises' assets. . . . [A]ny goal-setting must be closely linked to putting the Enterprises in sound and solvent condition."[183] These contemporary statements align with the traditional understanding of conservatorship.

Congress did not repudiate common-law conservatorship in FIRREA or HERA. Instead, it consistently authorized the FDIC and then FHFA to put entities in a "sound and solvent condition," "carry on th[eir] business," and "preserve and conserve th[eir] assets and property."[184] Neither HERA's general powers, implied powers, nor right to act in FHFA's own best interest is the kind of "contrary direction" that quells common-law conservatorship.[185] A conservatorship of Fannie Mae or Freddie Mac (here, both) sways an entire industry. Given the potential effect on markets, firms, and consumers, partial suggestions are not enough to show that HERA inverted traditional conservatorship.[186] "Conservator" is an old role's anchor, not a new role's banner.[187]

B

Now to apply this understanding of conservator powers to the Third Amendment. We hold the Shareholders stated a plausible claim that the Third Amendment exceeded statutory authority. Transferring substantially all

---

[183] 2012-2014 Enterprise Housing Goals, 77 Fed. Reg. 67535, 67549–50 (Nov. 13, 2012) (emphasis added); *see also* Fannie Mae and Freddie Mac Loan Purchase Limits: Request for Public Input on Implementation Issues, 78 Fed. Reg. 77450, 77451 (Dec. 23, 2013) (describing authority to "preserve and conserve" GSEs' assets as "FHFA's conservator obligation").

[184] 12 U.S.C. §§ 4617(b)(2)(D) (HERA), 1821(d)(2)(D) (FIRREA).

[185] *Morissette*, 342 U.S. at 263.

[186] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.").

[187] *See Castleman*, 572 U.S. at 162 (stating that Congress intends to incorporate settled meaning of common-law terms it uses); *Morissette*, 342 U.S. at 263 (holding that Congress, in using term of art, presumably adopts its legal tradition and meaning).

capital to Treasury, without limitation, exceeds FHFA's powers to put the GSEs in a "sound and solvent condition," "carry on the[ir] business," and "preserve and conserve [their] assets and property."[188] We ground this holding in statutory interpretation, not business judgment.

In adopting the net worth sweep, the Agencies abandoned rehabilitation in favor of "winding down" the GSEs. Treasury announced that the Third Amendment would "expedite the wind down of Fannie Mae and Freddie Mac" and ensure that the GSEs "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."[189] The FHFA acting Director also said that the Third Amendment "reinforce[d] the notion that the [GSEs] will not be building capital as a potential step to regaining their former corporate status."[190] In a report to Congress, FHFA explained that it was "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac."[191] For reasons we are about to explain, this "wind down" exceeded the conservator's powers and is the type of transaction reserved for a receiver.

As a textual matter, the net worth sweep actively undermined pursuit of a "sound and solvent condition," and it did not "preserve and conserve" the GSEs' assets.[192] Treasury has collected $195 billion under the net worth sweep.[193] This alone exceeds the $187 billion it invested.[194] After paying back

---

[188] 12 U.S.C. § 4617(b)(2)(D).

[189] Compl. ¶ 135 (quoting Press Release, Dep't of Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012)).

[190] *Id.* ¶ 140 (quoting Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Sen. Comm. on Banking, Hous., & Urban Affairs (Apr. 18, 2013)).

[191] *Id.* (quoting FHFA, Report to Congress 2012, at 13 (June 13, 2013)).

[192] 12 U.S.C. § 4617(b)(2)(D).

[193] Compl. ¶¶ 25, 87.

[194] *Id.*

more than the initial investment, the GSEs remain on the hook for Treasury's entire $189 billion liquidation preference.[195] And under the net worth sweep, Treasury has a right to the GSEs' net worth in perpetuity.[196]

FHFA had authority, of course, to pay back Treasury for the GSEs' draws on the funding commitment. The funding commitment provided liquidity and took on risk, so Treasury was also entitled to compensation for the cost of financing. But the net worth sweep continues transferring the GSEs' net worth indefinitely, well after Treasury has been repaid and the GSEs returned to sound condition. That kind of liquidation goes beyond the conservator's powers.

FIRREA precedent confirms that this exceeds statutory conservator powers. In *Elmco Properties*, the Fourth Circuit held that a creditor was unlawfully deprived of its claim because it never received notice of the receivership.[197] The creditor had notice of a conservatorship. But "the RTC as conservator cannot . . . liquidate a failed bank. Instead, the conservator's function is to *restore the bank's solvency* and *preserve its assets*."[198] Dividing up and distributing the institution's property is inconsistent with a conservator's powers, so the creditor in *Elmco* was not on inquiry notice to pursue its claim.[199] To "wind down" the GSEs' affairs here, FHFA needed to follow HERA's carefully crafted receivership procedures. But FHFA was never appointed receiver, so it lacked authority to bleed the GSEs' profits in perpetuity.

---

[195] The $189 billion figure is $187 billion drawn, plus an initial $1 billion liquidation preference per GSE. *Id.* ¶¶ 8, 87, 152.

[196] *Id.* ¶ 25.

[197] *Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 922 (4th Cir. 1996).

[198] *Id.* (emphasis added).

[199] *See id.*

No. 17-20364

Finally, based on the Shareholders' allegations, the net worth sweep is inconsistent with conservatorship's common-law meaning. In *United States v. Chemical Foundation*, the Supreme Court characterized a wartime enemy-property custodian as "a mere conservator" with "the powers of a common-law trustee."[200] And a common-law conservator may not give the ward's assets to a single shareholder, just as a fiduciary or trustee may not do so.[201] Admittedly, HERA modified the common-law meaning in some ways, such as by permitting use of enumerated powers in FHFA's best interest.[202] But in more relevant areas HERA provided no "contrary direction" against the common-law meaning:[203] It did not authorize a conservator to "wind down" the ward's affairs or perpetually drain its earnings. Under traditional principles of insolvency, investors and the market reasonably expect a conservator to "operate, rehabilitate, reorganize, and restore the health of the troubled institution," not summarily take its property.[204] The Third Amendment inverts traditional conservatorship.

It is worth noting that the facts at this stage are distinguishable from those in some sister-circuit decisions. The Shareholders appeal from a dismissal under Rule 12(b)(6). The complaint alleges facts showing ultra vires action that were not present in some other cases. For example, emails suggest

---

[200] 272 U.S. at 10 (interpreting Trading with the Enemy Act of October 6, 1917, Pub. L. No. 65-91, § 12, 40 Stat. 411, 423 (codified as amended at 50 U.S.C. § 4312)).

[201] *See* UNIF. PROB. CODE § 5-418(a) ("A conservator . . . is a fiduciary and shall observe the standards of care applicable to a trustee."); *Conservator*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "conservator" as "[a] guardian, protector, or preserver").

[202] 12 U.S.C. § 4617(b)(2)(J)(ii); *cf. Perry Capital*, 864 F.3d at 643 (Brown, J., dissenting in part) (stating limited interpretation of best-interests clause).

[203] *Morissette*, 342 U.S. at 263.

[204] Michael Krimminger & Mark A. Calabria, *The Conservatorships of Fannie Mae and Freddie Mac: Actions Violate HERA and Established Insolvency Principles* 42–43 (Cato Inst., Working Paper No. 26, 2015).

that the Agencies designed the Third Agreement to prevent Fannie and Freddie from recapitalizing. National Economic Council advisor Jim Parrott, who worked with Treasury in developing the net worth sweep, allegedly wrote: "[W]e've closed off [the] possibility that [Fannie and Freddie] ever[] go (pretend) private again."[205] Similarly, when Bloomberg published a comment that "[w]hat the Treasury Department seems to be doing here, and I think it's a really good idea, is to deprive [Fannie and Freddie] of all their capital so that [they can not go private again]," Parrott emailed the source: "Good comment in Bloomberg—you are exactly right on substance and intent."[206] The emails reinforce that the Third Amendment "deprive[d]" the GSEs of their capital, keeping them in a permanent state of suspension, which is not authorized by statutory conservator powers.[207]  The pleadings in *Jacobs v. Federal Housing Finance Agency*[208] and *Perry Capital LLC v. Mnuchin*[209] appear to lack similar allegations. That factual difference distinguishes them.

But *Saxton v. Federal Housing Finance Agency*[210] and *Roberts v. Federal Housing Finance Agency*[211] had facts similar to the Shareholders' allegations here. So we recognize that our decision conflicts with at least some other circuits. The conflict is whether HERA authorized FHFA to adopt the Third Amendment. We think that, in interpreting HERA's conservatorship and

---

[205] Compl. ¶ 107 (alterations in original).

[206] *Id.*

[207] Compl. ¶ 107.

[208] 908 F.3d 884 (3d Cir. 2018).

[209] 864 F.3d 591 (D.C. Cir. 2017).

[210] 901 F.3d 954, 957 (8th Cir. 2018); *see* Amended Complaint ¶ 92, *Saxton v. FHFA*, No. 15–CV–47–LRR (N.D. Iowa Feb. 9, 2016), ECF No. 61 (alleging similar email communications).

[211] 889 F.3d 397, 402 (7th Cir. 2018); *see* Amended Complaint ¶ 106–07, *Roberts v. FHFA*, No. 1:16-cv-2107 (N.D. Ill. Apr. 5, 2016), ECF No. 22 (alleging similar email communications).

receivership scheme, FHFA's general powers should not render specific ones meaningless. This is especially true because, although HERA qualifies traditional conservatorship, it does not eviscerate it. So traditional principles of insolvency and FIRREA decisions remain relevant. And they counsel against a near-limitless view of FHFA's conservator powers.

The complaint states a plausible claim that FHFA exceeded its statutory authority. Judge Haynes's dissent suggests that the Shareholders could waive the legal standard for reviewing the grant of a motion to dismiss. But the Supreme Court explained in *Iqbal* that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[212] The standard is generally applicable, and we see no exception here. When we reverse the grant of a motion to dismiss, the district court may decide if fact issues require trial or if summary judgment should be granted.[213] The proper remedy is to reverse the motion-to-dismiss denial and remand Count I for further proceedings.

## VII

We now turn to Count IV, the Shareholders' constitutional claim. Although the Shareholders could theoretically obtain full relief under Count I alone, they appeal from the dismissal of that count, so the parties have yet to litigate it to judgment. On the constitutional claim, in contrast, both sides moved for summary judgment in the district court. So we consider whether the

---

[212] 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

[213] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (holding that trial court shall grant a motion for summary judgment if there is no genuine issue for trial); 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1349 (3d ed. 2019) ("These seven defenses [in Rule 12(b)(1)–(7)] are permitted to be asserted prior to service of a responsive pleading because they present preliminary or threshold matters that normally should be adjudicated early in the action.").

No. 17-20364

Shareholders are entitled to some or all of their requested relief on this record alone. We first consider Count IV's justiciability based on standing and the succession provision.[214]

A

Federal courts have power to decide "Cases" and "Controversies."[215] "That case-or-controversy requirement is satisfied only where a plaintiff has standing."[216] At its "irreducible constitutional minimum," standing requires plaintiffs to show they suffered "an injury in fact," the injury is "fairly traceable" to the defendant's actions, and the injury will "likely . . . be redressed by a favorable decision."[217] "The party invoking federal jurisdiction bears the burden of establishing these elements."[218] Here, the summary-judgment standard applies to jurisdictional facts.[219]

The Shareholders suffered injury in fact. The required injury to challenge agency action is minimal: The Supreme Court has "allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax."[220] The Agencies contend that, by the time of the net worth sweep, the Shareholders had no rights to dividends and their shares were delisted from

---

[214] For completeness, we note the Agencies do not argue that the anti-injunction provision prevents relief on Count IV.

[215] U.S. CONST. art. III, § 2.

[216] *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008).

[217] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations and internal quotation marks omitted).

[218] *Id.* at 561.

[219] *See id.*

[220] *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (citations omitted).

the New York Stock Exchange. But pumping large profits to Treasury instead of restoring the GSEs' capital structure is an injury in fact.[221]

The Shareholders' injury is traceable to the removal protection. The Agencies contend that the President's undisputed control over FHFA's counterparty, Treasury, shows that a President-controlled FHFA would have adopted the net worth sweep. But standing does not require proof that an officer would have acted differently in the "counterfactual world" where he was properly authorized.[222] In *Free Enterprise Fund*, the Supreme Court explained that "the separation of powers does not depend on the views of individual Presidents, nor on whether 'the encroached-upon branch approves the encroachment.'"[223] And in *Bowsher v. Synar*, the Court said that "[t]he separated powers of our Government cannot be permitted to turn on judicial assessment of whether an officer exercising executive power is" likely to be fired.[224] The Shareholders observe that FHFA's status as an "independent" counterparty could actually have boosted the Third Amendment's political salability. Fortunately, under *Synar* and *Free Enterprise Fund*, we need not weigh in on that counterfactual.

---

[221] *See Perry Capital*, 864 F.3d at 632 (finding injury in fact because shareholders alleged that "the Third Amendment, by depriving them of their right to share in the Companies' assets when and if they are liquidated, immediately diminished the value of their shares").

[222] *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 512 n.12 (2010).

[223] *Id.* at 497 (citations omitted) (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).

[224] 478 U.S. 714, 730 (1986); *see also Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000) ("There is certainly no rule that a party claiming constitutional error in the vesting of authority must show a direct causal link between the error and the authority's adverse decision . . . . *Bowsher v. Synar* extended this principle to general separation-of-powers claims." (citation omitted)).

## No. 17-20364

And the relief sought would redress the Shareholders' injury. The Agencies contend that vacating past agency action is improper in a removal case and in this case particularly. But the form of injunctive or declaratory relief is a merits question.[225] The Shareholders seek, among other things, vacatur of the net worth sweep. That would redress their injury.

The Shareholders have standing.

### B

The succession provision does not bar Count IV because it does not bar any direct claims.[226] A plaintiff with Article III standing can maintain a direct claim against government action that violates the separation of powers.[227] In *Bond v. United States* the Supreme Court collected numerous separation-of-powers cases litigated by individuals with an otherwise-justiciable case or controversy.[228] "If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object."[229]

There is a separate reason the succession provision does not bar the Shareholders' constitutional claim. "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."[230]

---

[225] *See Warth v. Seldin*, 422 U.S. 490, 500–02 (1975) (presuming merits of complaint for purposes of standing analysis).

[226] *See* 12 U.S.C. § 4617(b)(2)(A) (providing that FHFA succeeds to shareholder rights "with respect to the regulated entity and the assets of the regulated entity"); *Roberts*, 889 F.3d at 408; *Perry Capital*, 864 F.3d at 624.

[227] *See Free Enter. Fund*, 561 U.S. at 487–91 (holding court had jurisdiction over declaratory judgment action alleging violation of separation of powers).

[228] 564 U.S. 211, 223 (2011) (citing *Free Enter. Fund*, 561 U.S. 477; *Clinton v. City of New York*, 524 U.S. 417 (1998); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995); *Synar*, 478 U.S. 714 (1986); *INS v. Chadha*, 462 U.S. 919 (1983); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

[229] *Id.*

[230] *Webster v. Doe*, 486 U.S. 592, 603 (1988).

No. 17-20364

Only a "heightened showing" in the statute may be interpreted to "deny any judicial forum for a colorable constitutional claim."[231] Here, the succession provision does not cross-reference the Administrative Procedure Act's general rule that agency action is reviewable.[232] It does not directly address judicial review at all. This is not the kind of "heightened showing"[233] or "'clear and convincing' evidence"[234] required for Congress to deny review of constitutional claims.

## VIII

The Shareholders are entitled to judgment on Count IV.

## A

HERA's for-cause removal protection infringes Article II. It limits the President's removal power and does not fit within the recognized exception for independent agencies. That exception, established in *Humphrey's Executor v. United States*, has applied only to multi-member bodies of experts.[235] A single agency director lacks the checks inherent in multilateral decision making and is more difficult for the President to influence.[236] We reinstate Part II B 2 of the panel opinion, which holds that FHFA's structure is unconstitutional.[237] That Part explains that the Director's removal protection, in combination with

---

[231] *Id.*

[232] 5 U.S.C. § 702.

[233] *Webster*, 486 U.S. at 603.

[234] *Johnson v. Robinson*, 415 U.S. 361, 373 (1974) (quoting *Abbott Labs.*, 387 U.S. at 141).

[235] 295 U.S. 602, 628–32 (1935).

[236] *See id.* at 624 (stating that the Federal Trade Commission is a "body of experts").

[237] *Collins*, 896 F.3d at 659–75. This opinion supersedes the panel opinion in remaining part. *See, e.g.*, *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193, 1194 (5th Cir. 1986) (en banc) (reinstating parts of panel opinion).

other FHFA features, is inconsistent with Article II and the separation of powers. It also distinguishes the D.C. Circuit's *PHH Corp.* decision.[238]

We disagree with Judge Higginson's attempt to distinguish this removal protection from those the Supreme Court has held unconstitutional. He cites scholarship that HERA's "for cause" removal provision gives less protection than statutes limiting removal to "inefficiency, neglect of duty, or malfeasance in office."[239] Initially, requiring "cause" for removal is well recognized as an independent agency's threshold feature.[240] And in *Synar*, when the Supreme Court considered a statute permitting Congress to remove an official for "inefficiency," "neglect of duty," or "malfeasance," it held this alternative language is quite broad.[241] True, the removal protection that *Free Enterprise Fund* held unconstitutional was exceptionally strict.[242] But the Court held that the proper amount of second-level removal protection there was *none*, not a relaxed amount.[243]

Judge Higginson also points to uncertainty about whether and how a removal would unfold. But the Court in *Synar* "reject[ed] [the] argument that consideration of the effect of a removal provision is not 'ripe' until that provision is actually used."[244] In *Synar* this was because Congress's removal

---

[238] *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75 (D.C. Cir. 2018) (en banc).

[239] *Humphrey's Ex'r*, 295 U.S. at 619 (quoting Federal Trade Commission Act, 15 U.S.C. § 41).

[240] *See Free Enter. Fund*, 561 U.S. at 483 ("Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause.").

[241] *Synar*, 478 U.S. at 729.

[242] 561 U.S. at 503 ("A Board member cannot be removed except for willful violations of the Act, Board rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance . . . .").

[243] *Id.* at 509 ("Concluding that the removal restrictions are invalid leaves the Board removable by the Commission at will, and leaves the President separated from Board members by only a single level of good-cause tenure.").

[244] 478 U.S. at 727 n.5.

authority gave it effective control over the Comptroller in the status quo.[245] Although here the problem is an absence of control, not its misplacement, the same "ripeness" principle applies.

B

The Agencies contend the Shareholders are not entitled to relief for other reasons. They first say that the FHFA acting Director who adopted the Third Amendment was, unlike a normally appointed Director, not insulated from removal. Under 12 U.S.C. § 4512(b)(2), the Director serves for five years "unless removed before the end of such term for cause by the President." That provision does not explicitly address acting Directors. Under 12 U.S.C. § 4512(f), the President chooses any acting Director from among the Deputy Directors. And that provision does not explicitly address removal.

But HERA unequivocally says what kind of agency it creates: "There is established the Federal Housing Finance Agency, which shall be an independent agency of the Federal Government."[246] In history and Supreme Court precedent, Presidential removal is the "sharp line of cleavage" between independent agencies and executive ones.[247] So we do not read the procedural guidance for choosing an acting Director to override the removal restriction, much less FHFA's central character. Instead, we read these provisions together.[248] The removal restriction applied to the acting Director.

Judge Costa's contrary authorities are distinguishable. In *Swan v. Clinton*, the D.C. Circuit held that the President could remove a National

---

[245] *Id.*

[246] 12 U.S.C. § 4511(a).

[247] *Wiener v. United States*, 357 U.S. 349, 353 (1958).

[248] *See King*, 502 U.S. at 221 (applying "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (citation omitted)).

Credit Union Administration Board member serving in a "holdover" capacity.[249] But here the FHFA acting Director was not a holdover serving past his term's end. So at least one of *Swan*'s concerns, that "the absence of any term limit in the NCUA holdover clause enables holdover members to continue in office indefinitely," is misplaced.[250] And, while HERA's general removal protection is unequivocal,[251] in *Swan* "[t]he NCUA statute d[id] not expressly prevent the President from removing NCUA Board members except for good cause."[252] The court simply assumed the statute protected Board Members during their normal terms, then held any such protection did not extend to holdover Members.[253] In short, *Swan* interprets a different statute and has limited value for generalizing a rule.

Judge Costa also cites the Office of Legal Counsel opinion *Designating an Acting Director of the Bureau of Consumer Financial Protection*.[254] That opinion is about filling a vacancy under the CFPB's enabling statute and the Federal Vacancies Reform Act. Its reasoning includes a general rule that statutory removal protection does not extend to anyone temporarily performing an office.[255] But it relies principally on *Swan* for that proposition, and it doesn't explain why the same rule cuts across different enabling

---

[249] 100 F.3d 973 (1996).

[250] *Id.* at 987.

[251] 12 U.S.C. § 4512 ("The Director shall be appointed for a term of 5 years, unless removed before the end of such term for cause by the President.").

[252] 100 F.3d at 981.

[253] *Id.* at 983 ("[W]e will assume *arguendo* that Board members have removal protection during their appointed terms and focus instead on determining whether, even if that is so, holdover members are similarly protected.").

[254] 41 Op. O.L.C. ___, 2017 WL 6419154 (Nov. 25, 2017) (interpreting 12 U.S.C. § 5491 and 5 U.S.C §§ 3345-3349d).

[255] *Id.* at *7.

No. 17-20364

statutes. As a matter of statutory interpretation, HERA's removal restriction applied to the acting Director here.

C

Treasury also contends that FHFA in its conservator capacity does not exercise executive power, so violating the separation of powers was harmless here. Treasury cites *Beszborn*, where we held that the RTC as receiver exercised nongovernmental power in suing on behalf of the institution in receivership.[256] "[T]he suit was purely an action between private individuals."[257] So later criminal prosecution of the same defendants did not violate the Double Jeopardy Clause because the first "punishment," the civil suit, was not sought by a sovereign.[258] Treasury also observes that private parties are sometimes appointed as receivers.[259]

Whether an agency exercises government power as conservator or receiver "depends on the context of the claim."[260] In *Slattery*, the Federal Circuit held that the FDIC as receiver acted for the United States when it retained a surplus from the seized bank's assets.[261] "[T]he claims [we]re asserted against the government, seeking return of the monetary surplus obtained for the seized bank."[262] So the bank's former shareholders could maintain their claims against the United States.[263]

---

[256] *United States v. Beszborn*, 21 F.3d 62, 68 (5th Cir. 1994).

[257] *Id.*

[258] *Id.*

[259] *See* 12 U.S.C. § 191 (authorizing Comptroller of the Currency to appoint receiver); 12 C.F.R. § 51.2 ("The Comptroller . . . may appoint any person, including the OCC or another government agency, as receiver for an uninsured bank.").

[260] *Slattery v. United States*, 583 F.3d 800, 827 (Fed. Cir. 2009).

[261] *Id.* at 828.

[262] *Id.* at 827.

[263] *Id.* at 827–28.

No. 17-20364

The Third Amendment has more in common with *Slattery* than with *Beszborn*, showing that it invoked executive power. In *Beszborn*, we took care to say the receiver's action on the bank's behalf benefited "all stockholders and creditors of the bank" rather than "the United States Treasury."[264] The Third Amendment reversed this precisely. It transferred the wards' assets to the government, similar to retaining the liquidation surplus in *Slattery*.[265] FHFA is a federal agency, empowered by a federal statute, enriching the federal government. It adopted the Third Amendment with federal governmental power. And that power was executive in nature. The Agencies do not contend, nor could they, that the Third Amendment was quasi-legislative or quasi-judicial.[266]

Treasury's remaining arguments do not budge this point. It cites 12 U.S.C. § 191 and 12 C.F.R. § 51.2 as evidence that private parties can be receivers. But every conservator or receiver relies on some public authority, whether court or agency.[267] Even in Treasury's example, "[t]he receiver performs its duties under the direction of the Comptroller."[268] In this case, Congress empowered FHFA as a federal agency.[269] Absent that authority there

---

[264] 21 F.3d at 68.

[265] *See* 538 F.3d at 827–28.

[266] *Cf. First Fed. Sav. Bank & Tr. v. Ryan*, 927 F.2d 1345, 1359 (6th Cir. 1991) ("[T]he appointment of a conservator or receiver is not a 'judicial power' . . . . We believe that the power given to the Director to appoint a conservator or receiver is an executive power.").

[267] *E.g. Booth v. Clark*, 58 U.S. 322, 331 (1854) ("The receiver is but the creature of the court; he has no powers except such as are conferred upon him by the order of his appointment and the course and practice of the court . . . ."); *see* 28 U.S.C. § 959 (providing that actions against court-appointed receivers are "subject to the general equity power of such court so far as the same may be necessary to the ends of justice"); FED. R. CIV. P. 66 ("[T]he practice in administering an estate by a receiver . . . must accord with the historical practice in federal courts or with a local rule.").

[268] 12 C.F.R. § 51.2(a).

[269] 12 U.S.C. § 4511(a) ("There is established the Federal Housing Finance Agency, which shall be an independent agency of the Federal Government.").

would be no conservatorship and no Third Amendment. And every federal agency must function within the federal Constitution's checks and balances. As then-Judge Kavanaugh explained in his *PHH Corp.* dissent, a constitutional agency structure serves "to protect liberty and prevent arbitrary decisionmaking by a single unaccountable Director."[270]

Finally, Treasury's attempt to distinguish the Third Amendment from governmental power is not, in any event, a standing argument. In the Appointments Clause case *Freytag v. Commissioner*, the Supreme Court held that whether the official acted as an Officer of the United States in the particular decision challenged was "beside the point" for standing purposes.[271] The Court rejected the Commissioner's argument that the taxpayers lacked standing to complain about the special trial judge's role in other cases.[272] If by statute he performed at least some duties of an Officer of the United States, his appointment must accord with Article II.[273] This case is analogous.[274]

\* \* \*

The Constitution bounds Congress's power to create agencies, draw their structure, and grant them authority. Agencies with removal-protected principal officers were a unique, but recognized, blend of legislative, executive, and judicial powers long before the FHFA. Their unique position has also been relatively static, until recently. The removal-protected FHFA Director is a new

---

[270] 881 F.3d at 186 (Kavanaugh, J., dissenting).

[271] 501 U.S. 868, 882 (1991).

[272] *Id.*

[273] *Id.*; *see also Dep't of Transp. v. Ass'n of Am. R.Rs.*, 135 S. Ct. 1225, 1232 (2015) (holding Amtrak was a government entity in part because "rather than advancing its own private economic interests, Amtrak is required to pursue numerous, additional goals defined by statute").

[274] *See Free Enter. Fund*, 561 U.S. at 497–98 (holding separation of powers requires Presidential oversight of the executive power).

innovation and falls outside the lines that *Humphrey's Executor* recognized. Granting both removal protection and full agency leadership to a single FHFA Director stretches the independent-agency pattern beyond what the Constitution allows.

No. 17-20364

HAYNES, Circuit Judge, joined by STEWART, Chief Judge, and DENNIS, OWEN, SOUTHWICK, GRAVES, HIGGINSON, COSTA, and DUNCAN, Circuit Judges:

Some of us[1] agree with the conclusion reached in Section VIII.A–C of the majority en banc opinion that the FHFA is unconstitutionally structured, and some of us[2] conclude otherwise, but we all agree that, given the holding of the majority of the en banc court reversing the district court on this point and finding the FHFA to be unconstitutionally structured, it is necessary to reach the question of what remedy is appropriate for the structure found to be unconstitutional by the majority. We now turn to the remedy question.

When addressing the partial unconstitutionality of a statute such as this one, we seek to honor Congress's intent while fixing the problematic aspects of the statute. Thus, in this case, the appropriate—and most judicially conservative—remedy is to sever the "for cause" restriction on removal of the FHFA director from the statute. *See* 12 U.S.C. § 4512(b)(2).

The remedial analysis here is informed by that in *Free Enterprise Fund*. We start from the "normal rule that partial, rather than facial, invalidation is the required course." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) ("'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'" (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006))). Just as in *Free*

---

[1] Judges Owen, Southwick, Haynes, Graves and Duncan agree that the FHFA is unconstitutionally structured. Judges Southwick, Haynes, and Graves concur in that conclusion only.

[2] Chief Judge Stewart and Judges Dennis, Higginson, and Costa.

*Enterprise Fund*, if we declare the "for cause" removal restriction unconstitutional, then the executive officer will immediately be subject to sufficient Presidential oversight. 561 U.S. at 509. Finally, nothing in the statutory scheme suggests that Congress would prefer a complete unwind of actions taken by the FHFA to an FHFA director removable at will. Thus, severance of the "for cause" restriction remedies the Shareholders' injury as found by the majority of this court of being overseen by an unconstitutionally structured agency.

Here it is also "true that the language providing for good-cause removal is only one of a number of statutory provisions that, working together, produce a constitutional violation." *Id.* But, as the Supreme Court recognized, we should not roam further to invalidate other provisions or modify the statute's requirements. The other options would be far more invasive and "editorial." *Id.* at 510. Instead, we pursue a path that respects the legislative decisions made by the Congress that passed HERA and the legislative power of the current Congress to amend the statute without unwarranted disruption.

The Shareholders ask that we also invalidate the Net Worth Sweep, claiming the remedy must resolve the injury. Assuming *arguendo* that an injury in the form of an unconstitutionally structured agency exists,[3] the Shareholders may not pick and choose among remedies based on their preferences. The Shareholders' complaint requested that a court invalidate only the Net Worth Sweep. They never requested a declaratory judgment about the PSPAs as a whole or even the Third Amendment. That is because the rest of the deal is a pretty good one for them: who would not want a virtually unlimited line of credit from the Treasury? Yet the Shareholders'

---

[3] As noted above, there are differing views surrounding the constitutionality issue.

constitutional theory is that everything the FHFA has done since its inception is void because it was an unconstitutionally structured agency.[4] They never explain why if all acts were void (or voidable), they are entitled to pick and choose a single provision to invalidate. That is inconsistent with the usual course of remedies. *See Fed. Ins. Co. v. Singing River Health Sys.*, 850 F.3d 187, 198 n.5 (5th Cir. 2017) (noting that accepting the premise that a party to an invalid contract could pick which parts to enforce would lead to an "absurd result"); RESTATEMENT (SECOND) OF CONTRACTS § 383 (AM. LAW. INST. 1981) ("A party who has the power of avoidance must ordinarily avoid the entire contract, including any part that has already been performed. He cannot disaffirm part of the contract that is particularly disadvantageous to himself while affirming a more advantageous part . . . .").

Generally, there are at least two classes of cases where the appropriate remedy is to invalidate an action taken by an unconstitutional agency or officer. First, the Supreme Court has invalidated actions by actors who were granted power inconsistent with their role in the constitutional program. For example, the Shareholders' marquee case for their theory is *Bowsher v. Synar*, 478 U.S. 714 (1986). There, Congress delegated executive authority to a congressional officer. *Id.* at 732–34. But "Congress [could not] grant to an officer under its control what it [did] not possess." *Id.* at 726. The Supreme Court declared unconstitutional the statutory power that impermissibly empowered the congressional officer to exercise executive authority. *Id.* at

---

[4] They attempt to temper that theory by arguing that legal challenges might still not succeed due to standing, statutes of limitations, and potential ratification of past actions. But their theory is nonetheless that everything the FHFA has done is void.

No. 17-20364

734–36.[5]  Because the officer never should have had the authority in the first place, courts would naturally invalidate exercises of the authority.  *Id.*; *cf. Nguyen v. United States*, 539 U.S. 69, 71 (2003) (vacating and remanding a case where an officer appointed under Article IV exercised Article III judicial authority).  The Supreme Court has also invalidated exercises of authority that steal constitutionally specified power from other branches.  *See Clinton*, 524 U.S. 417; *INS v. Chadha*, 462 U.S. 919 (1983).

Second, the Court has invalidated actions taken by individuals who were not properly appointed under the Constitution.  It has thus vacated and remanded adjudications by officers who were not appointed by the appropriate official, *see Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018), or who skipped Senate confirmation through misuse of the Recess Appointments Clause, *see NLRB v. Noel Canning*, 573 U.S. 513 (2014).

A common thread runs through these two categories.  In each, officers were vested with authority that was never properly theirs to exercise.  Such separation-of-powers violations are, as the D.C. Circuit put it, "void *ab initio.*" *Noel Canning v. NLRB*, 705 F.3d 490, 493 (D.C. Cir. 2013), *aff'd but criticized*, 573 U.S. 513.

Restrictions on removal are different.  In such cases the conclusion is that the officers are duly appointed by the appropriate officials and exercise authority that is properly theirs.  The problem identified by the majority decision in this case is that, once appointed, they are too distant from presidential oversight to satisfy the Constitution's requirements.

---

[5] The Court in *Bowsher* determined that the "issue of remedy" for the separation-of-powers violation at issue was "a thicket we need not enter," because Congress had provided "fallback" provisions in the statute in case it was invalidated.  *Id.* at 734–35.

Perhaps in some instances such an officer's actions should be invalidated. The theory would be that a new President would want to remove the incumbent officer to instill his own selection, or maybe that an independent officer would act differently than if that officer were removable at will. We have found no cases from either our court or the Supreme Court accepting that theory.

But even if that theory is right, it does not apply here for two reasons. First, the action at issue is the adoption of the Net Worth Sweep, and the President had adequate oversight of that action. The entire PSPAs, including the Third Amendment's Net Worth Sweep, were created between the FHFA and Treasury. During the process, the Treasury was overseen by the Secretary of the Treasury, who was subject to at will removal by the President. The President, thus, had plenary authority to stop the adoption of the Net Worth Sweep. This is thus a unique situation where we need not speculate about whether appropriate presidential oversight would have stopped the Net Worth Sweep. We know that the President, acting through the Secretary of the Treasury, could have stopped it but did not.[6]

Second, we can take judicial notice of this reality: subsequent Presidents have picked their own FHFA directors, allaying concerns that the removal restriction prevented them from installing someone who would carry out their policy vision. After the adoption of the Net Worth Sweep, President Obama selected a Director who was confirmed by the Senate. Once confirmed, that

---

[6] We do not hold that plaintiffs asserting a separation-of-powers claim bear the burden of proving a different outcome absent a removal restriction. *See Free Enter. Fund*, 561 U.S. at 512 n.12. We hold only that plaintiffs may not sue to invalidate an agency action due to lack of presidential oversight when their allegations show that the President had oversight of the action.

director authorized filings in this court that supported and defended the Net Worth Sweep. He never questioned its propriety. President Trump later selected an acting Director under the Vacancies Reform Act. He never questioned the propriety of the Net Worth Sweep and reaffirmed the previous administration's position. President Trump has since selected a new director. He has not filed anything in this court or made any judicially noticeable statement opposing the Net Worth Sweep. The Net Worth Sweep has thus transcended political affiliations and traversed presidential administrations— even when an issue like the constitutionality of the structure of the FHFA has divided different directors. Were these Presidents concerned about invalidating the Net Worth Sweep, they could have picked different Directors who would carry out that vision, either in action or in litigation. These subsequent picks' affirmation of the Net Worth Sweep demonstrates without question that invalidating the Net Worth Sweep would actually erode executive authority rather than reaffirm it. *See Lucia*, 138 S. Ct. at 2055.

Our decision not to invalidate the Net Worth Sweep is thus grounded in our respect for the Constitution and our co-equal branches of government. Undoing the Net Worth Sweep, as suggested by the dissenting opinion, would wipe out an action approved or ratified by two different Presidents' directors under the guise of respecting the presidency; how does that make sense? Here, the Constitution commits executive authority to the President. The President had full oversight of the adoption of the Net Worth Sweep, and each President since has appointed FHFA Directors who have affirmed it. We should not invalidate those Presidents' executive actions by invoking their need to exercise executive authority.

One final point: any remedy that invalidates the Net Worth Sweep without a judgment that fixes the constitutional problems would be

particularly perverse.  The FHFA could not ratify any previous actions or even continue operating because it would still suffer the same separation-of-powers defects we have identified here—just without an explicit declaration fixing the issue.  We would invalidate an entire agency without any precedent directing us to do so.  Similarly, there is no virtue in declaring the agency action unlawful then punting the form that judgment should take back to the district court.  The only judgment the Shareholders are entitled to is the one the Supreme Court has given in similar removal-restriction cases, which is a declaration removing the "for cause" provision found unconstitutional by a majority of this court.  Sending the case back for further litigation would cast one of the most financially consequential agencies into chaos.  It would also further muddy our precedent on the appropriate remedy in removal-restriction cases.

In summary, the Shareholders' ongoing injury, if indeed there is one,[7] is remedied by a declaration that the "for cause" restriction is declared removed.  We go no further.  We will not let the Shareholders pick and choose parts of the PSPAs to invalidate when the President had adequate oversight over their adoption and particularly when two different presidents have selected agency heads who have supported the Net Worth Sweep.  The appropriate remedy is the one that fixes the Shareholders' purported injury.  That is exactly what our declaratory judgment does.  Consequently, we decline to invalidate the Net Worth Sweep or PSPAs.[8]  Instead, we conclude, given that the majority of the court has found the FHFA unconstitutionally structured, that the appropriate remedy for that finding is to declare the "for cause" provision severed.

---

[7] *See* n.3 *supra.*

[8] Because we reject the Shareholders' request to unwind the Net Worth Sweep, we do not in this section address whether § 4617(f) would bar such relief if it were otherwise necessary.

No. 17-20364

STUART KYLE DUNCAN, Circuit Judge, joined by OWEN, Circuit Judge, concurring:

While I join all of Judge Willett's superb majority opinion, I do not join his separate opinion that concludes the proper remedy for the separation-of-powers violation here is to vacate the Third Amendment. To the contrary, the proper remedy—as Judge Haynes cogently explains in her separate majority opinion—is to sever the for-cause removal provision from the challenged statute. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (*"PCAOB"*) ("'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'") (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006)). I write separately to explain why I think the Supreme Court's precedents compel that narrower remedy.

To justify vacating the Third Amendment, Judge Willett asserts that "the action of an unconstitutionally-insulated officer . . . must be set aside." Willett Dissent at 1. I can find no support for that categorical proposition. Judge Willett relies principally on *Bowsher v. Synar*, 478 U.S. 714 (1986), but *Bowsher* is off-point. *Bowsher* involved a challenge—not to an executive-branch official "insulated" from presidential oversight—but to the Comptroller General, essentially a legislative officer, removable by Congress, who was purporting to exercise executive power. *See* 478 U.S. at 728 (noting Comptroller General was removable by joint resolution "at any time" so that the officer "should be brought under the sole control of Congress") (quotes omitted); *id.* at 730 (noting "Congress has consistently viewed the Comptroller General as an officer of the Legislative Branch"). This Article I creature, *Bowsher* unsurprisingly told us, "may not be entrusted with executive powers."

61

*Id.* at 732. And, in any event, *Bowsher* concluded that the "issue of remedy" for the separation-of-powers violation was "a thicket we need not enter," because Congress had provided a "fallback" provision should the act be invalidated. *Id.* at 734, 735; *see also id.* at 718–19 (describing "fallback" process). Thus, I do not read *Bowsher* as providing much, if any, guidance as to the remedy for an unconstitutionally insulated agency.

Putting *Bowsher* aside, more recent Supreme Court authority confirms my view that severance is the proper remedy for the separation-of-powers violation before us. In *PCAOB*, the petitioners argued that the agency's "freedom from Presidential oversight and control rendered it and all power and authority exercised by it in violation of the Constitution." 561 U.S. at 508 (quotes omitted). But the Court "reject[ed] such a broad holding" and deployed the narrower remedy of severing the unconstitutional culprit—there, the second layer of for-cause removal. *Id.* at 509–10. Moreover, for remedial purposes *PCAOB* contrasted an unconstitutionally *insulated* officer with an unconstitutionally *appointed* officer: The Court pointedly "[p]ut[ ] to one side petitioners' Appointments Clause challenges," *id.* at 508, which it addressed (and rejected) in another part of its opinion. *Id.* at 510–13. When the Court did later find an Appointments Clause violation in *Lucia*, its remedy was to vacate the prior actions of the invalidly appointed officers. *See Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018) (concluding "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official") (quoting *Ryder v. United States*, 515 U.S. 177, 183 (1995)). That is the kind of backward-looking remedy—vacating the Third Amendment—Judge Willett would apply here, but the Supreme Court's cases do not support applying it to fix an unconstitutionally insulated agency head.

Instead, as *PCAOB* indicates, the cure for that malady is narrower. Stripping away the FHFA Director's unconstitutional insulation is the "minimalist remedy" that "maintain[s] presidential control while leaving in place the regulatory functions of an agency." Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1261 (2014) (discussing *PCAOB*). Consequently, to remedy the separation-of-powers violation presented here, I would sever the for-cause removal provision, rendering the agency properly responsive to the President's "general administrative control of those executing the laws." *Myers v. United States*, 272 U.S. 52, 164 (1926).

No. 17-20364

ANDREW S. OLDHAM and JAMES C. HO, Circuit Judges, concurring in part and dissenting in part:

We join Judge Willett's opinion.[1]  We write separately in response to the suggestion that there is no constitutional problem because this case does not involve the Public Company Accounting Oversight Board ("PCAOB"), the Comptroller General, or the Postmaster General.  *Post*, at 97–107 (Higginson, J.).  Our learned colleague suggests that: (I) the Constitution's original public meaning offers little guidance on the scope of the removal power; (II) the Supreme Court's precedents don't help the shareholders here; and (III) even if they did, we have the "judicial" power to rewrite Congress's law.  With greatest respect, that's all wrong.

## I.

The Constitution vests in the President the power to remove executive officers.  Any intimation to the contrary must be rejected.

## A.

Traditionally, the executive power allowed the head of state to appoint and remove his ministers, as well as his judges, at will.  *See* 1 WILLIAM BLACKSTONE, COMMENTARIES *260 [hereinafter BLACKSTONE'S COMMENTARIES] (describing English efforts to "remove all judicial power out of the hands of the king's privy council"); *id.* at *261–63 (explaining that "the king is . . . the fountain of honour, of office, and of privilege," that the king holds

---

[1] We have lingering doubts about the meaning of the Housing and Economic Recovery Act's so-called "succession provision," 12 U.S.C. § 4617(b)(2)(A)(i).  But we agree with Judge Willett's opinion for the Court that, whatever the meaning of that provision, it's insufficiently clear to displace the presumption of reviewability under the Administrative Procedure Act. *See Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), *abrogated by statute in other part as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977).

"the prerogative of erecting and disposing of offices," and that "the king . . . is the best and only judge, in what capacities, with what privileges, and under what distinctions, his people are the best qualified to serve, and to act under him"); 2 THOMAS RUTHERFORTH, INSTITUTES OF NATURAL LAW 60 (1756) (noting that officers "are the agents of the executive power; and consequently the appointment of them belongs to this power"). The American colonies chafed at the corrupting effects of this unbridled power. *See, e.g.*, DECLARATION OF INDEPENDENCE para. 11 (1776) ("[The King] has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries"); DECLARATION OF RIGHTS AND GRIEVANCES para. 4 (1774) (condemning as "impolitic, unjust, and cruel, as well as unconstitutional" the Massachusetts Government Act, 14 Geo. 3 c. 45, which empowered the King's representative to appoint and remove—at will—the Province's officers and judges).

In response, some early State constitutions limited the executive power to appoint judges and officers. *See, e.g.*, S.C. CONST. of Mar. 26, 1776 art. XXII (assigning to the legislature the power to choose "the commissioners of the treasury, the secretary of the colony, register of mesne conveyances, attorney-general, and powder receiver"); VA. CONST. of 1776 paras. 35, 36 (requiring legislative approval for the governor's judicial appointments). Others limited the removal power, and granted civil and judicial officers freedom from executive interference "during good behavior."[2]    N.Y. CONST. of 1777, art. XXIV. *See also* MD. CONST. of 1776 art. XL (granting "good behaviour"

---

[2] This phrase derives from the English Act of Settlement, which stripped the Crown of the power to remove judges at will, and guaranteed judicial commissions "quamdiu se bene gesserint" ('during good behavior'). Act of Settlement, 1701, 12 & 13 Will. 3 c. 2 § 3.

tenure to the attorney-general); *id.* art. XLVIII (permitting the governor to remove only those "civil officer[s] who ha[ve] not a commission during good behavior"); MASS. CONST. of 1780 pt. 2, ch. III, art. 1 (providing that "[a]ll judicial officers . . . shall hold their offices during good behavior," but allowing the governor to remove them "with consent of the council . . . upon address of both houses of the legislature").

When the Framers drafted the federal Constitution, they had the same options before them. Ultimately, they chose to give Article III judges "good Behaviour" protection from presidential interference, *see* U.S. CONST. art. III, § 1, cl. 2, and mandated Senate approval for appointments of superior officers, *see* U.S. CONST. art. II, § 2, cl. 2. The Constitution therefore took away the traditional executive power to remove judges and to appoint officers unilaterally. But the Framers chose *not* to grant "good behavior" tenure to officers, as some States had done. By that omission, the Framers kept for the President the executive's traditional at-will removal power over superior officers.[3] *See* Steven Calabresi & Saikrishna Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541, 597 (1994).

---

[3] Congress may also remove "civil officers" for "Treason, Bribery, or other High Crimes and Misdemeanors" through impeachment and conviction. U.S. CONST. art. II, § 4. But this provision was inserted to limit Congress's impeachment power, rather than to abrogate the executive's removal power: In Britain at the time, "all the king's subjects, whether peers or commoners, [we]re impeachable in parliament." JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 283 (1833). Peers could be impeached "for any crime." 4 BLACKSTONE'S COMMENTARIES, *supra*, at *257. And some State constitutions permitted impeachment for "maladministration" in addition to misconduct. *See, e.g.*, MASS. CONST. of 1780 pt. 2, ch. I, § 2, art. VIII. The impeachment power in Article II therefore represents a narrowing of the legislature's traditional ability to interfere with executive affairs.

No. 17-20364

B.

What the text and structure of the Constitution provide, the historical practice confirms.  Start with the very first Congress.

On March 4, 1789, Congress convened in New York City.  1 ANNALS OF CONG. 15, 95 (1789).  One of its first orders of business was to propagate the Executive Branch.  Representative James Madison moved "that there shall be established an Executive Department, to be denominated the Department of Foreign Affairs, at the head of which there shall be an officer, to be called the Secretary to the Department of Foreign Affairs, who shall be appointed by the President, by and with the advice and consent of the Senate; and to be removable by the President."  *Id.* at 370–71.

The motion sparked a debate "centered around whether the Congress 'should recognize and declare the power of the President under the Constitution to remove the Secretary of Foreign Affairs without the advice and consent of the Senate.'"  *See Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (quoting *Myers v. United States*, 272 U.S. 52, 114 (1926)).  And it culminated in the famed "Decision of 1789" in which a majority of both legislative chambers agreed that "the Constitution's grant of executive power authorized the President to remove executive officers."  Saikrishna Prakash, *New Light on the Decision of 1789*, 91 CORNELL L. REV. 1021, 1023 (2006) [hereinafter Prakash, *Decision of 1789*]; *see also* 1 ANNALS OF CONG. at 399.

Up until the Civil War, there was virtually no doubt that the Decision of 1789 was correct.  Presidents Washington, Adams, and Jefferson relied on that power to remove over 170 officers.  Prakash, *Decision of 1789, supra*, at 1066.  In their respective Commentaries in the 1820s and 1830s, Chancellor James Kent and Justice Joseph Story considered the matter settled and beyond alteration.  *See Myers*, 272 U.S. at 148–50.

No. 17-20364

Congress briefly flirted with revisiting the issue after the Civil War. In 1867, Congress passed the Tenure of Office Act (over the President's veto), reversed its longstanding position, and claimed for itself the power to condition removal on the advice and consent of the Senate. *See* Tenure of Office Act, ch. 154, 14 Stat. 430 (1867). But even then, it was questionable whether Congress considered the Act to be constitutional. *See Free Enterprise Fund*, 561 U.S. at 494 n.3 (noting that the law "was widely regarded as unconstitutional and void (as it is universally regarded today)"). Its passage was undoubtedly motivated by animus towards President Johnson. *See* GROVER CLEVELAND, THE INDEPENDENCE OF THE EXECUTIVE 29 (1913). Less than two months into President Grant's tenure, it was repealed in part to permit the President to suspend officers "until the end of the next session of the Senate." 16 Stat. 6, 7. It was repealed in its entirety in 1887. *See* 24 Stat. 500.

The history of the use of the removal power—and congressional acquiescence in that use—matters. In interpreting the Constitution, "we put significant weight upon historical practice," particularly where the issues "concern the allocation of power between two elected branches of Government." *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014). Indeed, "a practice of at least twenty years duration on the part of the executive department, acquiesced in by the legislative department, is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning." *The Pocket Veto Case*, 279 U.S. 655, 690 (1929) (quotation omitted). We should therefore be especially hesitant to interfere with an executive power that was exercised, unfettered by Congress, for over 75 years.

No. 17-20364

## II.

The Supreme Court first squarely addressed the President's constitutionally vested removal power in 1926.[4] But once proved not enough. In the decades since, the Court has offered varying takes on the limits of that power—all apparently still good precedent. *See Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 483 (2010) ("The parties do not ask us to reexamine any of these precedents, and we do not do so."). Yet none of those precedents supports the novel limits on removal found in the Housing and Economic Recovery Act ("HERA"). Indeed, the lack of historical precedent to support HERA may be "the most telling indication of the severe constitutional problem" with it. *Id.* at 505 (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).

## A.

Let's start at the beginning. In *Myers*, the Court addressed "whether under the Constitution the President has the exclusive power of removing executive officers of the United States whom he has appointed by and with the advice and consent of the Senate." 272 U.S. at 60. The Court noted "[t]here is

---

[4] As to the pre-*Myers* corpus, Judge Higginson rightly notes that *United States v. Perkins*, 116 U.S. 483 (1886), and *United States v. Shurtleff*, 189 U.S. 311 (1903), are not especially salient for present purposes. *Post*, at 98 n.2 (Higginson, J.). That said, the Court's opinion in *In re Hennen*, 38 U.S. 230 (1839), offers insights into the Court's view of the Decision of 1789. Reflecting on the President's power to remove officers whom he appointed, the Court said "it was very early adopted, as the practical construction of the Constitution, that this power was vested in the President alone. And such would appear to have been the legislative construction of the Constitution." *Id.* at 259. And, by 1839, it had become "the settled and well understood construction of the Constitution, that the power of removal was vested in the President alone . . . although the appointment of the officer was by the President and Senate." *Ibid.*

no express provision respecting removals in the Constitution." *Id.* at 109. But it did not stop there.

Instead, the Court considered the original meaning of the "executive power," the Decision of 1789, and the President's duties under the Take Care Clause. As to the original meaning of the "executive power," the Court noted that both the Congress constituted under the Articles of Confederation and the British crown exercised executive power, and that as a part of that power, both the Congress and the crown could appoint and remove executive officers. *Id.* at 110, 118. The Court's extensive discussion of the Decision of 1789, *see id.* at 111–63, underscored the importance of that Congress's constitutional deliberation and the ensuing "clear affirmative recognition of [the Decision of 1789] by each branch of the government," *id.* at 163. And Chief Justice Taft considered the duties of his former post. Speaking from experience,[5] the Chief Justice explained that "when the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal." *Id.* at 122; *see* Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. PA. L. REV. 1835, 1836 (2016) ("Chief Justice Taft invoked [the Take Care Clause] to hammer home the implication that a President charged with exercising all of the executive power must have the means to control subordinates through whom he or she would necessarily act[.]"). On this point, text, history, and structure all aligned:

---

[5] Notably, when serving as President, Taft fired two members of the Board of General Appraisers. According to Professor Bamzai, that "was the first presidential for-cause removal." Aditya Bamzai, *Taft, Frankfurter, and the First Presidential For-Cause Removal*, 52 U. RICH. L. REV. 691, 691–92 (2018).

No. 17-20364

The vesting of the executive power in the President was essentially a grant of the power to execute the laws.  But the President alone and unaided could not execute the laws.  He must execute them by the assistance of subordinates. . . . As he is charged specifically to take care that they be faithfully executed, the reasonable implication, even in the absence of express words, was that as part of his executive power he should select those who were to act for him under his direction in the execution of the laws.  The further implication must be, in the absence of any express limitation respecting removals, that as his selection of administrative officers is essential to the execution of the laws by him, so must be his power of removing those for whom he cannot continue to be responsible.  It was urged that the natural meaning of the term 'executive power' granted the President included the appointment and removal of executive subordinates.  If such appointments and removals were not an exercise of the executive power, what were they?  They certainly were not the exercise of legislative or judicial power in government as usually understood.

*Myers*, 272 U.S. at 117–18 (citations omitted).

As the Court's opinion drew to a close, it returned to the Decision of 1789. The Court again emphasized that the first Congress "was a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument." *Id.* at 174–75.  And because the Court "found [its] conclusion strongly favoring the view which prevailed in the First Congress," it "ha[d] no hesitation in holding that conclusion to be correct." *Id.* at 176.  So the Court held "that the Tenure of Office Act of 1867, in so far as it attempted to prevent the President from removing executive officers who had been appointed by him by and with the advice and consent of the Senate, was invalid." *Ibid.*

Under *Myers*, this would be an easy case:  Any limit on the President's power to remove a principal executive officer is unconstitutional.

71

No. 17-20364

Our dissenting colleagues brush *Myers* aside based on this factual distinction:  *Myers* dealt with a statute requiring "the 'advice and consent of the Senate'" before the President could remove the officer, whereas HERA does not.  *Post,* at 99 (Higginson, J.) (quoting *Myers,* 272 U.S. at 60).  True enough.  But it was not the character of the limitation on the President's removal power that led the *Myers* Court to reject it.  Rather, it was the existence of *any* limitation at all—it was the denial of "the unrestricted power of removal" that the Court found invalid.  272 U.S. at 176.  *Myers* held the removal power belongs to the President alone, and Congress cannot constrain it.  *Ibid.*  Under *Myers,* HERA's removal restriction is unconstitutional.

B.

Of course, *Myers* was not the last word on the nature of the President's removal power.  In *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), the Supreme Court announced a different rule.  The *Humphrey's Executor* Court maintained that Congress could not prevent the President from removing any (principal) officers exercising "purely" executive power.  But it introduced the concept of administrative agencies that don't exercise executive power—a possibility *Myers* seemingly had not contemplated.  *See also* Prakash, *Decision of 1789, supra,* at 1071 (arguing the Decision of 1789 did not resolve whether Congress could limit the President's removal power for non-executive officers).  And for these non-executive administrative agencies, it approved greater restrictions on the President's removal power.  *Humphrey's Executor,* 295 U.S. at 631–32.

The administrative agency at issue was the Federal Trade Commission.  President Hoover appointed Humphrey as a Commissioner.  Soon after his election in 1932, President Roosevelt removed Humphrey from office.  *Id.* at 619.  To his dying day, Humphrey maintained he was still a Commissioner.

*Ibid.* Later, Humphrey's estate sued for his unpaid salary, claiming President Roosevelt lacked the power to remove an FTC Commissioner. *Ibid.* The estate pointed to the Federal Trade Commission Act, which provided that Commissioners would be appointed by the President, would serve for a certain term of years, and could be removed by the President "for inefficiency, neglect of duty, or malfeasance in office." *Id.* at 620 (citing Federal Trade Commission Act, ch. 311, § 1, 38 Stat. 717, 718 (1914) (codified as amended at 15 U.S.C. § 41)).

President Roosevelt had cited no "inefficiency, neglect of duty, or malfeasance in office" as cause for removing Humphrey. *Id.* at 620, 626. He simply wanted to appoint his own Commissioner with whom he "should have a full confidence." *Id.* at 620 (citing a letter from Roosevelt to Humphrey). Roosevelt's administration pointed to *Myers*. After all, *Myers* had recently confirmed that the Constitution grants the President unrestricted power to remove executive officers for any reason or no reason at all. *See* 272 U.S. at 176 (holding a statute that "attempted to prevent the President from removing executive officers who had been appointed by him . . . was invalid"). Roosevelt's administration argued that the *Myers* rule applied to the Federal Trade Commissioners, notwithstanding Congress's provision of a term of office and enumeration of causes justifying their removal. *Humphrey's Executor*, 295 U.S. at 626.

The Court disagreed. Relying on the FTCA's legislative history, it reasoned Congress had intended the FTC to function "wholly disconnected from the executive department." *Id.* at 630. The FTC was "to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality." *Id.* at 624. And the Court maintained that the FTC's "duties are neither political nor executive, but predominantly quasi judicial and quasi legislative."

No. 17-20364

*Ibid.* Moreover, the Court had no "doubt[s]" about "[t]he authority of Congress" to create such agencies and "to require them to act in discharge of their duties independently of executive control." *Id.* at 629. "[T]hat authority includes, as an appropriate incident, power to fix the period during which the [officers] shall continue, and to forbid their removal except for cause in the meantime." *Ibid.* In short, *Humphrey's Executor* held that officials exercising quasi-legislative or quasi-judicial power could be insulated by for-cause-removal protection because of the need to keep such officials "independent" of the executive. *Id.* at 628. If an officer "exercises no part of the executive power vested by the Constitution in the President," it says, Congress can limit the President's removal power. *Ibid.* On the other hand, if the officer is "purely executive," Congress cannot limit that power. *Id.* at 631–32 (affirming the *Myers* rule for purely executive officers). Thus, the scope of the President's removal power "depend[s] upon the character of the office." *Id.* at 631.

*Humphrey's Executor* is difficult to apply for two reasons. First, its division between purely executive and quasi-legislative or quasi-judicial does not map neatly onto modern understandings of executive power. *See Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988) (discussing "[t]he difficulty of defining such categories of 'executive' or 'quasi-legislative' officials"); *see also Bowsher*, 478 U.S. at 762 n.3 (1986) (White, J., dissenting). And second, the Supreme Court itself limited *Humphrey's Executor* in *Bowsher*. There, the Comptroller General was subject to removal only by Congress and only for cause. *See Bowsher*, 478 U.S. at 727–28. The Court held this violated the Constitution's separation-of-powers principles by making an official exercising executive power subservient to the legislative branch. *See id.* at 726, 732–33. The Comptroller General's primary duty was to prepare a detailed report in accordance with a legislative mandate. *Id.* at 732. The Court held that this

74

was an exercise of executive power: "Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Id.* at 733. That was so even though Congress "ha[d] consistently viewed the Comptroller General as an officer of the Legislative branch." *Id.* at 731. And in reaching its conclusion, the Court pointed to the Decision of 1789 as "provid[ing] contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing that instrument." *Id.* at 723–24.

Given that *Bowsher* turned on Congress's control over the executive officer in question—a problem undisputedly not at issue here—the dissenters are tempted to ignore *Bowsher* as irrelevant. *Post*, at 99 (Higginson, J.). But *Bowsher* is highly relevant in the way it cabins *Humphrey's Executor*. After *Bowsher*, Congress cannot legislate around the nature of executive power by creating an office that reports to another branch, rather than (or in addition to) reporting solely to the Executive Branch. *See* 478 U.S. at 731–32; *cf. Humphrey's Executor*, 295 U.S. at 628 (reasoning the FTC is not an executive agency because it was "created by Congress to carry into effect legislative policies . . . in accordance with the legislative standard . . . and to perform other specified duties as a legislative or as a judicial aid").

So what does *Humphrey's Executor* by way of *Bowsher* mean here? Well, the Federal Housing Finance Agency ("FHFA") Director obviously exercises executive power. As relevant to this case, FHFA implemented a statute—HERA—by making factual findings that triggered authorization to take over and operate the Government Sponsored Entities ("GSEs"). That's an executive act. *Cf. Gundy v. United States*, 139 S. Ct. 2116, 2140 (2019) (Gorsuch, J., dissenting) (explaining that "condition[ing]" the application of statutes "on fact-finding" by the executive has been "long associated with the executive

function"); *Department of Transportation v. Association of American Railroads*, 135 S. Ct. 1225, 1247 (2015) (Thomas, J., concurring in the judgment) (explaining that "conditional legislation does not seem to call on the President to exercise . . . legislative power" even though it makes the suspension or operation of statutory provisions "depend upon the action of the President based upon the occurrence of subsequent events, or the ascertainment by him of certain facts"); *Bushnell v. Leland*, 164 U.S. 684, 685 (1897) (rejecting the argument that "empowering [the comptroller] either to appoint a receiver or to make a ratable call upon the stockholders, is tantamount to vesting that officer with judicial power, in violation of the constitution"). Operating the GSEs in accordance with statutory directives is also executive. After all, "implement[ing] the legislative mandate is the very essence of 'execution' of the law." *Bowsher*, 478 U.S. at 733.

True, FHFA also has powers that might seem quasi-legislative. For example, it can promulgate regulations. *See, e.g.*, 12 U.S.C. §§ 4536, 4617(i)(8). But having that power cannot be enough to render an agency quasi-legislative for purposes of *Humphrey's Executor*. If it were, nearly every member of the President's cabinet would be a quasi-legislative official and could be given for-cause removal protection. And that can't be. *See Morrison*, 487 U.S. at 690 ("*Myers* was undoubtedly correct in its holding, and in its broader suggestion that there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role.").

But wherever you draw the line between "executive" and "quasi-legislative" power, the exercise of power at the heart of this case is executive.[6]

---

[6] Judge Higginson agrees that our inquiry should focus on the particular exercise of power at issue—here, "the FHFA's conservatorship function." *Post*, at 107. Our disagreement is

No. 17-20364

FHFA executed a contract and enforced its terms; that is the heartland of executive power. *See also* Part II.E, *infra*. In deciding this case or controversy, our constitutional analysis should focus on the nature of the agency action being challenged—not the agency's power in the abstract. Thus, in relevant part, "the character of the office" held by the FHFA Director is executive. *Humphrey's Executor*, 295 U.S. at 631. Again, the for-cause removal restriction is invalid.[7]

## C.

In *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court arranged the removal precedents around a new organizing principle: Removal restrictions cannot unduly interfere with the President's fulfillment of his constitutional obligations—including the power to take care that the laws be faithfully executed. *Morrison* involved the Ethics in Government Act's provision for the appointment of an independent counsel to "investigate, and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws." *Id.* at 660 (discussing 28 U.S.C. §§ 591–99). The independent counsel, once appointed, could only be removed "by the personal action of the Attorney General and only for cause." *Id.* at 663 (quoting 28 U.S.C. § 596(a)(1)).

---

whether FHFA's "conservatorship function" is executive or something else. Our colleagues evidently think it is something else, but exactly what it is they do not say. *See ibid.*

[7] And even if we considered the FHFA Director to be both "quasi-legislative" and executive, then the FHFA's Director would fall into the "field of doubt" that *Humphrey's Executor* left for "future consideration." 295 U.S. at 632. And insofar as the "nature of the function" test discussed in *Wiener v. United States*, 357 U.S. 349, 353 (1958), was rooted in the "philosophy of *Humphrey's Executor*," *id.* at 356, applying that test here would yield similar results. The "intrinsic judicial character of the task" of the War Claims Commissioners led the Court to decide that case against President Eisenhower. *Id.* at 355. The executive function at issue here would command the opposite result.

There was "no real dispute that the functions performed by the independent counsel are 'executive' in the sense that they are law enforcement functions that typically have been undertaken by officials within the Executive Branch." *Id.* at 691. But the *Morrison* majority treated the categories used in *Humphrey's Executor* (executive vs. quasi-legislative or quasi-judicial) as relevant but not dispositive. We agree with our dissenting colleagues on this point: "*Morrison* downgraded *Wiener*'s and *Humphrey's Executor*'s inquiries from a determinative to a subsidiary level." *See post*, at 106 (Higginson, J.).

The *Morrison* Court instead concluded that the constitutionality of limitations on the President's removal power is not "define[d] [by] rigid categories of those officials who may or may not be removed at will by the President, but" aims to "ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Morrison*, 487 U.S. at 689–90. So, under *Morrison*, removal restrictions that do not limit "the President's ability to perform his constitutional duty" are permissible. *Id.* at 690.

The *Morrison* Court concluded the independent counsel's office survives this test. First, the Court deemed the independent counsel an inferior office "with limited jurisdiction and tenure and lacking policymaking or significant administrative authority." *Id.* at 691; *see also id.* at 671–72. Second, the Court noted that the President retained the ability to remove the independent counsel for cause (through the Attorney General). *Id.* at 692–93; *see also id.* at 696. Congress limited the removal power "to establish the necessary independence of the office," the Court concluded. *Id.* at 693. And in light of the independent counsel's status as an inferior officer accountable to the

Attorney General, such a limitation didn't unduly "interfere" with the President's constitutional duties. *Ibid.*

So what of the FHFA Director? Like the independent counsel, the FHFA Director exercises the executive power of implementing the laws. *See* Part II.B, *supra*. But unlike the independent counsel, the FHFA Director is a principal officer with significant authority, and he is not subject to significant presidential control through any other executive officer. FHFA's insulation from the ordinary appropriations process means its Director does not even answer to Congress. *Cf. Humphrey's Executor*, 295 U.S. at 628 (explaining the FTC is quasi-legislative because it acts "in aid of the legislative power" where it makes "investigations and reports . . . for the information of Congress"). And that also deprives the President of the control he exercises over most independent agencies, who "must participate in the annual budget cycle" under the oversight of the Office of Management and Budget.[8] Perhaps it's true that "[n]o man is an island." JOHN DONNE, DEVOTIONS UPON EMERGENT OCCASIONS, *Meditation XVII* 108 (Ann Arbor Paperback ed., 1959) (1624). But FHFA's Director comes pretty close.

To satisfy *Morrison*, "the Executive Branch" must have "sufficient control over" the independent officer "to ensure that the President is able to perform his constitutionally assigned duties." 487 U.S. at 696. Here, it's not clear the Executive Branch has any control at all.

---

[8] Eloise Pasachoff, *The President's Budget as a Source of Agency Policy Control*, 125 YALE L.J. 2182, 2203–04 (2016); *see also* Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 TEX. L. REV. 15, 42–43 (2010) ("If agencies must rely on OMB for budget requests, the President has a huge lever of power over the agency, whether or not the head of the agency is removable at will.").

No. 17-20364

D.

In *Free Enterprise Fund*, the Supreme Court made clear that *Morrison* only extends so far.  The *Free Enterprise Fund* Court dealt with the members of the Public Company Accounting Oversight Board ("PCAOB") who could be removed only by the Securities and Exchange Commission ("SEC").  561 U.S. at 483.  The PCAOB board members could only be removed by the SEC for cause, and the members of the SEC are principal officers who can only be removed by the President for cause.  *Id.* at 486–87.  The Court concluded this double for-cause protection arrangement violates the Constitution:

> This novel structure does not merely add to the Board's independence, but transforms it.  Neither the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the Board.

*Id.* at 496.  So the Court found PCAOB Commissioners could not constitutionally exercise executive power.  *See ibid.*

The Court reaffirmed its focus on the importance of the relevant office by distinguishing principal officers from inferior officers and inferior officers from mere employees.  *Id.* at 506 ("We do not decide the status of other Government employees, nor do we decide whether 'lesser functionaries subordinate to officers of the United States' must be subject to the same sort of control as those who exercise 'significant authority pursuant to the laws.'").  Thus, the above analysis concerning the status of a principal officer under *Morrison* applies here in much the same way.

But *Free Enterprise Fund* also emphasized a suspicion of novel agency structures.  Before the case came before the Supreme Court, then-Judge Kavanaugh had dissented from the D.C. Circuit's opinion upholding the PCAOB:

No. 17-20364

> *Humphrey's Executor* and *Morrison* represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power. Therefore, given a choice between drawing the line at the holdings in *Humphrey's Executor* and *Morrison* or extending those cases to authorize novel structures such as the PCAOB that further attenuate the President's control over executive officers, we should opt for the former. We should resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history. In this case, that sensible principle dictates that we hold the line and not allow encroachments on the President's removal power beyond what *Humphrey's Executor* and *Morrison* already permit.

*Free Enterprise Fund*, 537 F.3d at 698 (Kavanaugh, J., dissenting) (citations omitted). The Supreme Court shared his concern: "Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity." *Free Enterprise Fund*, 561 U.S. at 505 (quoting 537 F.3d at 699 (Kavanaugh, J., dissenting)).

The novel agency structure at issue in this case raises similar suspicions. Granting that the protections here are not a "Matryoshka doll of tenure protections," *id.* at 497, Congress nevertheless insulated the FHFA Director in an unprecedented way. The FHFA Director is a principal officer, not an inferior one or an employee; he exercises significant executive authority; and he does so by himself, not as part of a multi-member body. *Cf. PHH Corp. v. CFPB*, 881 F.3d 75, 198 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) (noting that another agency's "single-Director structure departs from settled historical practice, threatens individual liberty, and diminishes the President's Article II authority to exercise the executive power.").[9] HERA thereby grants

---

[9] Many have discussed the unique ways an independent agency headed by a single Director could undermine the President's Article II powers. *See ante*, at 46–47 (Willett, J.); *PHH Corp.*, 881 F.3d at 156–57 (Henderson, J., dissenting); *id.* at 183–84 (Kavanaugh, J.,

## No. 17-20364

"executive power without the Executive's oversight" and "subverts the President's ability to ensure that the laws are faithfully executed." *Free Enterprise Fund*, 561 U.S. at 498. Thus, FHFA fails under *Free Enterprise Fund* too.

### E.

Judge Higginson's principal response to all of this is that "FHFA's conservatorship function" is "a role one would be hard-pressed to characterize as near the heart of executive power." *Post*, at 107. We disagree. To our minds, you'd be hard-pressed to characterize it as anything *other than* executive power.

"The executive power" vested by Article II, Section 1, is the power of "*enforcing* the laws." 1 BLACKSTONE'S COMMENTARIES, *supra*, at \*146. At the Founding, the "executive power" was understood in contradistinction to the "legislative" power of "making the laws." *Ibid.*; *see also id.* at \*261; MATTHEW HALE, THE PREROGATIVES OF THE KING 176 (D.E.C. Yale ed. 1976). Without an executive to enforce, administer, or otherwise execute the law, legislation was a mere parchment barrier: "[T]he Vigour of the Laws consists in their Executive Power; Ten thousand Acts of Parliament signify no more than One Single Proclamation, unless the Gentlemen, in whose hands the Execution of those Laws is placed, take care to see them duly made use of . . . ." DANIEL DEFOE, THE POOR MAN'S PLEA 23 (2d ed. 1693). Thus, the power to execute the law is the power to follow a legislative instruction and "transform [legislative]

---

dissenting). When the Founders vested a single President with the executive power in Article II of the Constitution, they recognized that one person had the potential to act with greater speed, decisiveness, and secrecy than a multi-member body. *See* THE FEDERALIST NO. 70, at 424 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("Decision, activity, secrecy, and dispatch will generally characterize the proceedings of one man in a much more eminent degree than the proceedings of any greater number . . . .").

intentions into reality." Julian Davis Mortensen, *Article II Vests the Executive Power, Not the Royal Prerogative*, 119 COLUM. L. REV. 1169, 1236 (2019).

There can be no doubt that FHFA purported to "execute" HERA here— even if it did so unlawfully. *See ante*, at 50–52 (Willett, J.). It "made use of" the statute to adopt the Third Amendment. And it made use of the statute (and the Third Amendment) to sweep the GSEs' profits. That plainly constitutes "the executive power."

But suppose we're wrong that FHFA is an executive branch agency— where would you put it instead? FHFA is an agency of the federal government. *See* 12 U.S.C. § 4511(a) (establishing FHFA as "an independent agency of the Federal Government"); *id.* § 4617(b)(2)(J)(ii) (granting FHFA power to "take any action authorized by this section, which the Agency determines is in the best interests of . . . the Agency"). Surely Judge Higginson does not mean to suggest FHFA is exercising "legislative or judicial power in government as usually understood." *Myers*, 272 U.S. at 117–18.

It's irrelevant that the Secretary of the Treasury—the other party to the Net Worth Sweep—could veto the deal. *Cf. post*, at 105 (Higginson, J.); *post*, at 112–13 (Costa, J.). It has never been true that setting aside an officer's action in a case involving the removal power requires proof that an uninsulated officer would not have taken the challenged action. Such counterfactual causation is alien to the Supreme Court's interpretation of Article II. Neither appointment cases nor removal cases require it. *See Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000) ("There is certainly no rule that a party claiming

constitutional error in the vesting of authority must show a direct causal link between the error and the authority's adverse decision.").[10]

Take *Free Enterprise Fund*, for example. That case implicated both appointment and removal.  As to the former, the Court refused to require counterfactual causation as an element of standing to bring an appointment claim.  561 U.S. at 512 n.12 ("[S]tanding does not require precise proof of what the Board's policies might have been in that counterfactual world.").  And as to the latter, the Court likewise rejected counterfactual causation. The Court granted prospective relief requiring officers to be properly removable before exercising executive authority.  *Id.* at 513.  And it did so without analyzing whether less-insulated officers would make different decisions than the unconstitutionally insulated officers did.  If a plaintiff must show that a removable officer would make a different decision, then *Free Enterprise Fund*

---

[10] For the same reasons, it's irrelevant that the Third Amendment was adopted by an Acting Director of FHFA, rather than a Senate-confirmed Director.  *See post*, at 109 (Costa, J.).  The Acting Director serves until the appointment of a Director—the latter of whom is insulated by the for-cause removal restriction.  *See* 12 U.S.C. §§ 4512(b), 4512(f).  The President's power to replace the Acting Director with a for-cause insulated Director is a Damoclean sword that hardly solves the constitutional problem with the latter.  After we granted rehearing en banc, FHFA argued for the first time that the Acting Director can be replaced under the Federal Vacancies Reform Act ("FVRA").  That argument is forfeited under our longstanding rules.  *See Excavators & Erectors, Inc. v. Bullard Engineers, Inc.*, 489 F.2d 318, 320 (5th Cir. 1973) ("While these contentions may have had merit if timely raised in the district court, it is well established that . . . issues not raised or presented in the lower court will not be considered for the first time on appeal.").  It's also ironic because the Government argues the FHFA Director is not exercising executive power while justifying its constitutionality under a statute—the FVRA—that applies *only* to "an officer of an Executive Agency."  5 U.S.C. § 3345(a).  In all events, this point now appears moot because the Senate confirmed a permanent Director who enjoys for-cause insulation.  And almost immediately after his confirmation, that insulated Director revoked FHFA's prior concession regarding the unconstitutionality of the for-cause removal restriction, instead defended its constitutionality, and continued sweeping the GSEs' profits.

would not have granted relief without considering whether a more accountable officer would make different decisions.

Or take *NLRB v. Noel Canning*, 573 U.S. 513 (2014). By the time that case reached the Supreme Court, the NLRB already had new, validly appointed members. There was no evidence the new Board members were inclined to overturn the actions of the old, unconstitutionally appointed members. In fact, the litigants challenging the appointments told the Supreme Court that "going forward the government can solve the problem through agency ratification of past decisions." Transcript of Oral Argument at 66, *Noel Canning*, 573 U.S. 513 (No. 12-1281). Nevertheless, the Court invalidated the old members' decisions. *See Noel Canning*, 573 U.S. at 522 ("[T]hat the Board now unquestionably has a quorum does not moot the controversy about the validity of the previously entered Board order.").

The best support we can find for counterfactual causation is in the *Bowsher dissent*. It argued the unconstitutional removal provision was "unlikely to be" invoked, meaning in "political realit[y]" the officer's decision-making was unaffected. 478 U.S. at 730 (discussing Justice White's dissent). But the majority rejected that analysis: "The separated powers of our Government cannot be permitted to turn on judicial assessment of whether an officer exercising executive power is" likely to be fired. *Ibid.* "The Framers did not rest our liberties on such bureaucratic minutiae." *Free Enterprise Fund*, 561 U.S. at 500. Thus, there is no reason for us to speculate about what a more-accountable officer would have thought about the Net Worth Sweep. And the Treasury Secretary's agreement to the Net Worth Sweep doesn't tell us anything about the propriety of insulating the FHFA Director.

### III.

A majority of our Court believes that the appropriate remedy for the constitutional violation is to delete the offending statutory text. We respectfully disagree, because we do not think our limited Article III power to decide cases and controversies permits such a remedy.

The judicial power vested by Article III of the Constitution extends to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. It generally does not include the legislative power to erase, rewrite, or otherwise "strike down" statutes: "[U]nder our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973). Rather, "[c]onstitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court." *Ibid.* (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803)); *see also United States v. Godoy*, 890 F.3d 531, 539–40 (5th Cir. 2018) (explaining that the Supreme Court's declining to apply an unlawful statutory provision does not purge that provision from existence).

When then-Judge Scalia was sitting as a member of the three-judge district court in *Synar v. United States*, he recognized the importance of choosing a remedy that redresses the plaintiffs' injury-in-fact. *See Synar v. United States*, 626 F. Supp. 1374, 1393 (D.D.C.) (per curiam), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714 (1986). In that case, the constitutional violation was caused by a "combination" of statutes: one authorizing an officer to exercise executive power and another governing the appointment or removal of the officer in question. *Ibid.* Justice Scalia was faced with the question: Which statute should the court refuse to apply when either one would be constitutional in isolation? His answer was the statute that "allegedly

authorizes the injury-in-fact that confers standing upon the plaintiff." *Ibid.* (synthesizing numerous Supreme Court precedents). Because the injury-in-fact in that case was caused by the statutory grant of executive power, that grant had to "yield." *Id.* at 1393–94.

In this case, Plaintiffs are injured by the Net Worth Sweep—an exercise of executive power unconstitutionally granted by HERA. Plaintiffs lost the value of their investments because FHFA used the Net Worth Sweep to transfer their money to the Treasury. They ask us to "[v]acat[e] and set[] aside the [contract's] Net Worth Sweep" provision. Our Article III powers permit us to grant this remedy, as it would redress Plaintiffs' injury-in-fact. Such a remedy finds support in precedent. *See, e.g.*, *Noel Canning v. NLRB*, 705 F.3d 490, 493, 514–15 (D.C. Cir. 2013), *aff'd*, 134 S. Ct. 2550 (2014) (vacating the NLRB's order because the Board was unconstitutionally constituted); *see also Dresser-Rand Co. v. NLRB*, 576 F. App'x 332, 33–34 (5th Cir. 2014) (vacating Board's order that was issued by only two lawfully appointed members).

Instead of granting this remedy, a majority of our Court charts a different path. They seek to blue-pencil the statute by deleting the unconstitutional statutory provision. Such a remedy is improper for two reasons.

First, it affords Plaintiffs no relief whatsoever. On these facts, editing the statute would not resolve any case or controversy. Plaintiffs do not complain about the possibility of future regulatory activity. Instead, they complain only about a past decision made by the FHFA Director: contractually agreeing to the Net Worth Sweep. A complaint based solely on past violations cannot justify prospective relief ordering an agency to disregard a statutory provision going forward. In a case seeking redress for past harms such as this one, prospective relief is no relief at all. *Cf. Lucia v. SEC*, 138 S. Ct. 2044, 2055

n.5 (2018) (explaining that Appointments Clause remedies should be designed to preserve the separation of powers and "to create '[]incentive[s] to raise Appointments Clause challenges'" (quoting *Ryder v. United States*, 515 U.S. 177, 183 (1995)).

*Free Enterprise Fund* is the principal precedent for the majority's blue-pencil remedy. But there, the plaintiffs sought an injunction against future audits and investigations by the unconstitutionally insulated agency. To remedy the plaintiffs' prospective injury-in-fact, the Court refused to apply the statute insulating the officers from removal. *See* 561 U.S. at 508–10. The Court recognized that the statutory provision was "only one of a number of statutory provisions that, working together, produce a constitutional violation." *Id.* at 509. In refusing to apply the for-cause protection provision that insulated the PCAOB commissioners from removal, it applied the most modest remedy it could to redress the plaintiffs' injuries. Thus, the *Free Enterprise Fund* remedy was effectively an injunction ordering the agency to disregard the second layer of for-cause removal protection going forward, unless and until Congress chose to fix the constitutional violation in a different way. In this case, Plaintiffs did not complain about the threat of future harm, so blue-penciling the statute would not redress any injury they have alleged.

Strangely, our colleagues who argue that Plaintiffs lack standing to bring their constitutional claim also join a majority of the Court in endorsing a blue-penciling remedy. Nowhere in their opinion do they explain how our Court could purport to delete a statutory provision when there is no active case or controversy within the meaning of Article III. We think Plaintiffs do have standing, yet we cannot identify how deleting the FHFA Director's removal protection would redress any harm Plaintiffs have alleged. On what basis

could our colleagues possibly believe that a blue-penciling remedy is constitutionally permissible?  We can see none.

The second problem we have with the remedy endorsed by a majority of our Court is that we do not believe Article III of the Constitution permits us to "strike" the FHFA Director's for-cause protection from the statute.  *See Murphy v. NCAA,* 138 S. Ct. 1461, 1485 (2018) (Thomas, J., concurring) (explaining that "[e]arly American courts did not have a severability doctrine" because "[t]hey recognized that the judicial power is, fundamentally, the power to render judgments in individual cases"); Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 936 (2018) (explaining "federal courts have no authority to erase a duly enacted law from the statute books" but have only the power "to decline to enforce a statute in a particular case or controversy" and "to enjoin executive officials from taking steps to enforce a statute"); Kevin C. Walsh, *Partial Unconstitutionality*, 85 N.Y.U. L. REV. 738, 756 (2010) (explaining that the Founders did not conceive of judicial review as the power to "strike down" legislation).

At the Constitutional Convention, several delegates, including James Wilson and James Madison, argued for a "Council of Revision" comprised of federal judges and the executive.  Mitchell, *supra,* at 954.  The Council would have had the power to veto legislation passed by Congress, subject to congressional override.  *Ibid.*  A veto of legislation would render it "void," without any legal effect.  *Ibid.*  That proposal was defeated at the Convention on June 4, 1787.  *Id.* at 957.  Wilson and Madison tried again on July 21, but again they were defeated.  *Id.* at 958.  Finally, on August 15, they made one last attempt to give the judiciary a veto over federal legislation, proposing that the Supreme Court be given the power to veto legislation independent of the

President, subject to congressional override. *Id.* at 958–59. Again, they were defeated. *Id.* at 959.

In the final Constitution, the judiciary was given only the power to decide cases and controversies—to resolve legal disputes between parties and order remedies to redress injuries. Thus, when a court concludes that a statute is unconstitutional, it is not "striking down" or "voiding" or "invalidating" the law. It is merely holding that the law may not be applied to the parties in the dispute. The Constitution does not empower courts to delete sections of state and federal codes. The Founders expressly considered the possibility of a judicial veto, and they rejected it multiple times during the Constitutional Convention.

This history has been obscured by rhetoric that Chief Justice Marshall used in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), to explain judicial review. In that case he famously declared that a statute found unconstitutional by a court becomes "entirely void," "invalid," and "not law." *Id.* at 177–78. Subsequent cases have compounded the confusion. *See, e.g.*, *The Civil Rights Cases*, 109 U.S. 3, 26 (1883) (holding "void" sections 1 and 2 of the Civil Rights Act of 1875). Nevertheless, it is indisputable that courts do not have the power to erase duly enacted statutes. Instead, they may decline to enforce them or enjoin their future enforcement to resolve cases and controversies.

Our Court should not add to the confusion about the judiciary's limited powers by claiming to "sever" a statute based on open-ended speculation about how Congress would have solved the separation-of-powers problem. And we certainly should not rewrite the statute while pretending such *legislative* activity is the most modest *judicial* remedy. We would instead remand to the

No. 17-20364

district court with instructions to fashion a remedy that actually redresses Plaintiffs' harms.

\*   \*   \*

Whether we apply the Constitution's original public meaning, *Myers*, *Humphrey's Executor*, *Morrison*, or *Free Enterprise Fund*, the conclusion in this case is the same. The FHFA Director cannot exercise the executive power of the United States because he is unconstitutionally insulated from presidential control and accountability. And our Court does not have the power under Article III to order a remedy that does not redress Plaintiffs' injuries.

No. 17-20364

HAYNES, Circuit Judge, joined by STEWART, Chief Judge, and DENNIS, SOUTHWICK, GRAVES, HIGGINSON, and COSTA, Circuit Judges, dissenting with respect to statutory claims:

I conclude—as the panel in this case and five other circuits have held—that 12 U.S.C. § 4617(f) bars us from granting the relief that the Shareholders seek on their statutory claims. *See Jacobs v. FHFA*, 908 F.3d 884 (3d Cir. 2018); *Saxton v. FHFA*, 901 F.3d 954 (8th Cir. 2018); *Roberts v. FHFA*, 889 F.3d 397 (7th Cir. 2018); *Robinson v. FHFA*, 876 F.3d 220 (6th Cir. 2017); *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). This court's role is not to question why as to the benefits and detriments of the Net Worth Sweep. Instead, under a statutory challenge to the FHFA's conduct, our court must examine the statute in question and apply it.

Every court to address the issue agrees that the core question is whether the FHFA acted within its statutory authority. It is the core question because § 4617(f) states that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver" unless otherwise specified by statute or requested by the Director. The Shareholders argue that the FHFA has exceeded its statutory "powers or functions . . . as a conservator or a receiver" such that the bar does not apply. So I examine whether adopting the Net Worth Sweep was within those statutory powers.

Given HERA's grant of extensive powers to the FHFA, I conclude that the FHFA acted within its statutory powers when it adopted the Net Worth Sweep. The FHFA's "powers are many and mostly discretionary." *Jacobs*, 908 F.3d at 889. To begin with, once a conservator, the FHFA takes over the rights and powers of the shareholders, officers, and directors. 12 U.S.C. § 4617(b)(2)(A)(i). It is then free to then "conduct all business of the regulated

entity" without any restriction on that grant of power. *See id.* § 4617(b)(2)(B)(i).

Most importantly, when the FHFA conducts a company's business, it does not have to consider the interests of shareholders. HERA dictates that the Director "ensure that . . . the activities of each regulated entity and the manner in which such regulated entity is operated are consistent with the public interest." *Id.* § 4513(a)(1)(B)(v). Most sweepingly, the FHFA may "take any action authorized by [§ 4617], which the [FHFA] determines is in the best interests of the regulated entity [e.g., the GSEs] *or the Agency* [i.e., *the FHFA*]." *Id.* § 4617(b)(2)(J)(ii) (emphasis added). As Judge Stras said, "That is no typo. The FHFA can operate critically important businesses, with trillions of dollars in assets and the financial support of the federal government, in its own best interests—apparently to the exclusion of the interests of the American people, Fannie and Freddie, and their shareholders." *Saxton*, 901 F.3d at 960 (Stras, J., concurring). On top of that, the decision about what is in the FHFA's best interest is committed to the FHFA.

This broad statutory grant of authority undermines the Shareholders' core arguments. To begin with, the Shareholders argue that the statute requires the FHFA to pursue the goal of "preserving and conserving" assets and operating the GSEs in a "sound and solvent" manner. But those quoted terms are snippets from only some of the provisions in § 4617 granting the FHFA authority. *See* 12 U.S.C. § 4617(b)(2)(B)(iv), (b)(2)(D). When reviewed in context, each of those provisions is written as a permissive grant of authority. For example, § 4617(b)(2)(D) begins, "The Agency may, as conservator, take such action as may be . . . ." Other provisions, like § 4617(b)(2)(B)(i) and § 4617(b)(2)(J)(ii), grant the FHFA authority unrestricted by the goals of asset preservation and solvency.

No. 17-20364

Undeterred, the Shareholders argue that though the snipped provisions use "may," they are actually mandatory and constrain all other grants of authority. Their theory is that "may" is "a simple concession to the practical reality that a conservator may not always succeed in rehabilitating its ward." *See Perry Capital*, 864 F.3d at 638 n.1 (Brown, J., dissenting). But when "may" and "shall" appear in the section, "the normal inference is that each is used in its usual sense—the one act being permissive, the other mandatory." *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947). Congress uses "shall" to note mandatory responsibilities, even when the officer carrying them out cannot possibly succeed. *See, e.g.*, 28 U.S.C. § 547 ("[E]ach United States attorney, within his district, shall . . . prosecute for all offenses against the United States . . . ."). For instance, in the very same section, the FHFA is told it "shall seek to develop incentives for claimants to participate in the alternative dispute resolution process." 12 U.S.C. § 4617(b)(7)(B). "Shall" makes the command mandatory, while "seek" signals that the FHFA might still fail. Congress could have used similar language to constrain the FHFA's actions, but it chose not to.

The Shareholders also argue that the word "conservator" connotes a requirement that the FHFA "conserve" assets. They rely on the common law meaning of the term, which they believe Congress reflected in the statute. Congress is free to use common law terms in statutes, which courts then look to when interpreting the statute in the absence of statutory definitions. But that general rule gives way when the statute dictates otherwise. *See, e.g.*, *Taylor v. United States*, 495 U.S. 575, 594 (1990). Here, HERA's statutory scheme is inconsistent with the traditional notions of a conservator. Common law conservators are supposed to look out for the rights of shareholders or other beneficiaries. But the FHFA looks out for the public's and its own interests, a key difference from common law conservatorships. So this court

94

cannot read any common law principles into Congress's use of the word "conservator."

During oral argument before the en banc court, a member of our court suggested that this claim should not be resolved on a motion to dismiss because it includes factual allegations beyond what appeared before other courts of appeals. However, neither party had previously argued this point, each proceeding from the assumption that this was purely a legal issue that could be resolved on a motion to dismiss. Indeed, the term "plausible" as it relates to the Shareholders' complaint appears nowhere in their briefing. Instead, the Shareholders focused their assertions on the contention that the FHFA exceeded its statutory powers as a matter of *law*. They certainly never argued that there are "fact issues" that need to be litigated or more fully developed as it pertains to their statutory arguments regarding § 4617(f). It is hardly novel law that an appellant's failure to brief an issue waives it. *See, e.g., Singh v. RadioShack Corp.*, 882 F.3d 137, 149 (5th Cir. 2018).

Despite the clear waiver, that en banc oral argument question has now morphed into the holding of the majority opinion on this issue. The majority opinion concludes that the Shareholders stated a "plausible" claim that the FHFA exceeded its statutory authority in enacting the Third Amendment and remands for "further proceedings." Now, due to the majority opinion's departure from the Shareholders' arguments, will the district court be required to hold a trial on FHFA's intent? That makes little sense.

Even if this argument were not waived, it still does not pass muster as a distinction from the other circuits' decisions. First, the complaints in the previous suits all alleged that the FHFA did not have the intent of conserving the GSEs' capital, even if they did not cite every piece of evidence supporting that view. Second, and more importantly, the statute permits the FHFA to act

in the public's or its own interest, and the statute commits the decision of what is in the FHFA's best interest to itself. So even if those agencies' subjective intent—whatever that means—was to operate Fannie Mae and Freddie Mac for its or the public's benefit, the statute allows the FHFA to do so.

Nothing about this case alters the robust case law from other circuits. I would join all our sister circuits that have considered this question and rejected the Shareholders' statutory claim. The Shareholders have not shown that the FHFA exceeded its enormous grant of authority. I conclude that § 4617(f) bars us from "tak[ing] any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver." Because the Shareholders' statutory claims would "restrain or affect" the FHFA's acting in its role as conservator, the Shareholders' claims should fail. I would affirm the district court's order granting the Agencies' motions to dismiss the Shareholders' APA claims because such claims are barred by 12 U.S.C. § 4617(f). I respectfully dissent from the contrary decision to remand.

No. 17-20364

STEPHEN A. HIGGINSON, Circuit Judge, joined by STEWART, Chief Judge, and DENNIS and COSTA, Circuit Judges, dissenting in part:

It is wrong to declare the FHFA unconstitutionally structured. Neither the parties nor the majority has addressed the statutory text central to the constitutional issue: the provision establishing the FHFA Director's five-year term "unless removed before the end of such term for cause by the President." 12 U.S.C. § 4512(b)(2). For-cause removal provisions typically enumerate the specific grounds that would justify removal, such as "inefficiency, neglect of duty, or malfeasance in office." *See Humphrey's Executor v. United States*, 295 U.S. 602, 619 (1935) (quoting 15 U.S.C. § 41). This one does not. Thus, it is concerning that no one in this litigation has addressed why or how § 4512(b)(2) is an undue impediment to removal in practice; indeed, no one has even suggested what § 4512(b)(2)'s text means.[1] Furthermore, no one has identified an entity empowered to block a presidential removal under § 4512(b)(2).

It is unwise to base a momentous constitutional ruling on the expected effects of a statutory provision no one has made the effort to construe.

***

The Constitution affords sparse materials to resolve this question—only broad pronouncements that "[t]he executive Power shall be vested" in the President and that "he shall take Care that the Laws be faithfully executed." Art. II §§ 1, 3. These clauses say nothing about removal of executive-branch officers, and there is little that is tractable or manageable in them compared, for instance, to the Appointments Clause. *See* Art. II § 2. That clause

---

[1] The en banc D.C. Circuit's decision on the constitutionality of the Consumer Financial Protection Bureau's design elicited varying views on this question as to the for-cause removal protection of that agency's director. *Compare PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 122–24 (D.C. Cir. 2018) (Wilkins, J., concurring), *with id.* at 124–37 (Griffith, J., concurring).

distinguishes between categories of officers and specifies who may appoint so-called "inferior" officers. *Id.* These specifications helpfully structure a well-developed case law on presidential appointments. *See, e.g.*, *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051–56 (2018); *Edmond v. United States*, 520 U.S. 651, 658–66 (1997). No such specificity guides us here.

What we have instead is a relatively limited body of modern Supreme Court decisions. Only six cases, decided over eighty-five years, comprise the corpus of relevant precedential material. On the one side, three cases identify unconstitutional limits on the presidential removal power. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010); *Bowsher v. Synar*, 478 U.S. 714 (1986); *Myers v. United States*, 272 U.S. 52 (1926). On the other, three cases uphold limits on the presidential removal power. *See Morrison v. Olson*, 487 U.S. 654 (1988); *Wiener v. United States*, 357 U.S. 349 (1958); *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).[2] As with the sparseness of constitutional text, the limited extent of this caselaw counsels, at minimum, caution before we announce from the bench that Congress has violated the Constitution.[3]

---

[2] One might also place *United States v. Perkins*, 116 U.S. 483 (1886), concerning a cadet engineer in the Navy, and *United States v. Shurtleff*, 189 U.S. 311 (1903), concerning a "general appraiser of merchandise," in the corpus of removal cases, but their remoteness in time and the simplicity of the positions at issue—relative to the complexity of modern administrative agency design—make them minor parts of that corpus for present purposes. Presidential removal was at issue also in *Mistretta v. United States*, 488 U.S. 361 (1989), regarding the U.S. Sentencing Commission, but the Court's animating concern in that instance was interference with judicial power, not executive.

[3] The concurring opinion that responds to my views misses that my dissent is fundamentally rooted in the principle of judicial restraint. This principle must be our guide "in cases of peculiar delicacy," such as those that challenge the constitutionality of Congress's enactments. *See McCulloch v. Maryland*, 17 U.S. 316, 401 (1819) (Marshall, C.J.). Moreover, I do not recognize my views in the paraphrases that the concurring opinion gives of them. At the very beginning, for instance, the concurring opinion imputes views to me about "original public meaning" and "'judicial' power to rewrite Congress's law," yet neither is an argument I elaborate here.

Two of the three cases striking down limits on the presidential removal power are plainly beyond the circumstances here, because they addressed provisions that located control over removal wholly or partly in the legislative branch. *Bowsher* concerned a law assigning executive functions to the Comptroller General, an official removable only by Congress. 478 U.S. at 728–34. *Myers* concerned a postmaster whose removal by the President was subject to the "advice and consent of the Senate." 272 U.S. at 60. Congress gave itself no such control over removal of the FHFA Director, so neither case furnishes a basis on which to find the FHFA unconstitutionally structured.

Appellants' constitutional challenge therefore stands or falls on *Free Enterprise Fund*, the only other Supreme Court decision fashioning the Constitution's scant textual materials into a rule by which we might invalidate an agency's structure. In *Free Enterprise Fund*, the Court affirmed the principle that "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." 561 U.S. at 483. *Free Enterprise Fund* addressed "something quite different": vesting the for-cause removal decision in officials who were themselves protected against removal without cause, thereby creating "two layers of good-cause tenure." *Id.* at 495, 497. Appellants thus have the difficult task of showing that *Free Enterprise Fund*, which affirmed one layer of good-cause tenure while condemning two, somehow requires us to invalidate the one layer protecting the FHFA Director.

In addition to showing that *Free Enterprise Fund* implicitly negated a principle it explicitly affirmed, Appellants must also confront three cases *approving* good-cause tenure: *Humphrey's Executor*, *Wiener*, and *Morrison*. These cases each affirmed Congress's power to insulate officials against

presidential removal. The cases affirmed that power in widely varying institutional contexts and despite circumstances that, under then-existing precedent, would make curtailment of Congress's power the expected outcome.

*Humphrey's Executor* came first, nine years after *Myers*'s ringing vindication of the President's "unrestricted power of removal." *See Myers*, 272 U.S. at 176. The case concerned the protection of Federal Trade Commission members from removal unless for "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 619. Given *Myers*'s emphatic declaration of principle, this insulation of FTC commissioners would surely fall. But it did not. A unanimous Supreme Court ruled that *Myers* "cannot be accepted as controlling [the] decision here." 295 U.S. at 627. The Court recognized Congress's power to create "quasi legislative or quasi judicial agencies" that could act "independently of executive control." *Id.* at 629. It read *Myers* as "confined to purely executive officers" and stated a new principle: that Congress's power to "preclud[e] a removal except for cause will depend upon the character of the office." *Id.* at 631–32.

Two decades later, the Supreme Court considered the removal of a member of the War Claims Commission, an adjudicatory body for claims of injury or property damage in the Second World War. *Wiener*, 357 U.S. at 350–51. Unlike the FTC statute at issue in *Humphrey's Executor*, the statute creating the War Claims Commission said nothing about removal. *Id.* at 352. One would think, therefore, that the President's removal power would operate unrestricted, per *Myers*. On the contrary, *Wiener* adhered to *Humphrey's Executor*'s distinction between purely executive officers and those meant to exercise independent judgment. Focusing on the "nature of the function that Congress vested in the War Claims Commission," the Court read for-cause removal protection into the statute. *Id.* at 353–56.

Three decades after *Wiener*, the Supreme Court considered the constitutionality of the independent counsel authorized by the Ethics in Government Act of 1978. *Morrison*, 487 U.S. at 660. The independent counsel was appointed by a special three-judge panel upon a referral from the Attorney General, and the office held a panoply of prosecutorial powers. *Id.* at 660–63. The Attorney General could remove the independent counsel "only for good cause, physical disability, mental incapacity," or other substantially impairing condition, with judicial review thereafter. *Id.* at 663. Because the independent counsel wielded the quintessentially executive power of criminal prosecution, one would expect the office's insulation from presidential removal would be unconstitutional, under either *Wiener*'s "nature of the function" or *Humphrey's Executor*'s "character of the office" inquiries. But that was not the Court's conclusion. *Morrison* reasoned that Congress's power "to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'" *Id.* at 689. Instead it applied a new test: whether "the Act, taken as a whole, violates the principle of separation of powers by unduly interfering with the role of the Executive Branch." *Id.* at 693. The Court ruled that the independent counsel statute did not cause such interference. Indeed, it listed the Attorney General's ability to remove the independent counsel for cause among the mechanisms adequately preserving presidential control. *Id.* at 693, 696.

Appellants thus confront a precedential barrier they cannot surmount: three cases affirming good-cause tenure in a variety of circumstances; and a fourth case affirming it again while invalidating a form of double good-cause tenure not present here.[4]

---

[4] The concurring opinion tries to sidestep the precedential barrier by turning to scholarship on the Decision of 1789 and other primary sources that reveal founding-era

No. 17-20364

Appellants' approach is to draw attention to a purportedly "unique constellation of independence-enhancing features" in the FHFA's design. This claim derives from phrases that the Court used in *Free Enterprise Fund*. *E.g.*, 561 U.S. at 483 (asking whether two "separate layers of protection may be *combined*"); *id.* at 510 (describing the PCAOB members' "good-cause removal" as "only one of a number of statutory provisions that, *working together*, produce a constitutional violation") (emphasis added). The majority opinion picks up on this language, deeming the FHFA's structure unconstitutional due to the "combined effect" of its "unique constellation of insulating features."[5] But these phrases in *Free Enterprise Fund* were used to describe the novel problem of two-layered good-cause tenure. The Court was clear that the problematic novelty at issue in *Free Enterprise Fund* was in contrast to the long-standing legitimacy of single-layered good-cause tenure:

> As explained, we have previously upheld limited restrictions on the President's removal power. In those cases, however, only one level of protected tenure separated the President from an officer exercising executive power. It was the President—or a subordinate he could remove at will—who decided whether the officer's conduct merited removal under the good-cause standard.

> The Act before us does something quite different. It not only protects Board members from removal except for good cause, but withdraws from the President any decision on whether that good cause exists. That decision is vested instead in other tenured officers—the Commissioners [of the SEC]—none of whom is subject to the President's direct control. The result is a Board that

---

viewpoints on presidential removal power. The concurring opinion relies on one side of a vigorous scholarly debate about these materials. Amici scholars have helpfully shown another, quite different side. *See* Brief of Harold H. Bruff, Gillian E. Metzger, Peter M. Shane, Peter L. Strauss, and Paul R. Verkuil, as *Amici Curiae* in Support of Defendants-Appellees, *Collins v. Mnuchin*, No. 17-20364 (5th Cir. Jan. 17, 2019).

[5] *See Collins v. Mnuchin*, 896 F.3d 640, 661, 670 (5th Cir. 2018) (per curiam). The en banc majority opinion incorporates the panel opinion's analysis. *See* Section VIII(A).

is not accountable to the President, and a President who is not responsible for the Board.

*The added layer of tenure protection makes a difference.*

591 U.S. at 495 (emphasis added). Thus, to import *Free Enterprise Fund*'s phrases describing novel structures into this case is to erase the distinction those descriptions were meant to draw.[6]

Appellants' challenge rests on a tenuous interpretation not only of *Free Enterprise Fund* but also of the scholarly literature on administrative agency design.[7] Appellants argue, and the majority opinion agrees, that various otherwise unremarkable agency design features, through undescribed alchemy, combine to make the FHFA Director unduly insulated from presidential control. But upon a closer look, these assertions are little more than debatable empirical claims—hardly the firm footing judges need to take the bold step of declaring Congress's agency design choices unconstitutional.

The majority opinion for the en banc D.C. Circuit addressing the constitutionality of the Consumer Financial Protection Bureau has already surveyed the dubious empirical propositions on which Appellants and the majority opinion depend. *See PHH Corp. v. Consumer Fin. Prot. Bureau*, 881

---

[6] For a thoughtful discussion of the significance that novelty should have in constitutional analysis of agency design, see Leah M. Litman, *Debunking Antinovelty*, 66 DUKE L.J. 1407 (2017).

[7] *See, e.g.*, Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (And Executive Agencies)*, 98 CORNELL L. REV. 769 (2013); Rachel Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 TEXAS L. REV. 15 (2010). One can only imagine the feelings of scholars who were motivated by the "urgent need" for better institutional design against the threat of agency capture, Barkow, 89 TEXAS L. REV. at 18, upon seeing their work turned into a constitutional cudgel against that design.

F.3d 75, 92–110 (D.C. Cir. 2018).[8] That wheel need not be reinvented here,[9] but a few points may usefully be added.

The majority opinion gives weight to the purportedly insulating effect of the FHFA's single-headed structure, but that structure may just as readily promote accountability as inhibit it, by spotlighting the obstacle in the way of the President's will. The majority opinion values the internal checks of a multi-member structure, particularly when bipartisan balance is required, but such structures tie a President's hands as much as free them. If the constitutional concern here is undue interference with presidential control, an agency structure requiring the President to appoint a political opponent can hardly be said to enhance presidential sway. Such a structure could not be said to have constitutional significance either. The Supreme Court never suggested in *Free Enterprise Fund* that the internal dynamics fostered by the PCAOB's multi-member structure might avoid a constitutional violation.[10] The dubiousness of these various claims in turn makes their "combined effect" yet more questionable.[11]

---

[8] The majority opinion expresses no disagreement with the en banc D.C. Circuit's analysis affirming the constitutionality of the CFPB, instead identifying "salient distinctions" between the CFPB and FHFA. *Collins*, 896 F.3d at 673. With that lack of disagreement I quite agree.

[9] *Cf. Consumer Fin. Prot. Bureau v. Seila Law LLC*, 923 F.3d 680, 682 (9th Cir. 2019), *petition for cert. docketed* (June 28, 2019) (No. 19-7) (likewise declining to "re-plow the same ground").

[10] A common argument from parties and judges skeptical of agency insulation is that the multi-member structure of the FTC—a "body of experts"—was an essential part of the Court's decision in *Humphrey's Executor* affirming the FTC's structure. *See, e.g., PHH Corp.*, 881 F.3d at 98–99 (majority opinion's explanation of challengers' argument); *id.* at 143, 150–51 (Henderson, J., dissenting). But that quote appeared in *Humphrey's Executor*'s treatment of a preliminary statutory issue, not in its constitutional analysis. *Compare* 295 U.S. at 621–26 (statutory); *id.* at 626–32 (constitutional); *see PHH Corp.*, 881 F.3d at 98–99 (making this observation).

[11] Relatedly, it is debatable that the FHFA's features are in fact unique. One scholarly treatment of "indicia of independence" identified seven salient features, of which the FHFA

As I suggested at the outset, Appellants have not elaborated how for-cause removal protection itself is an undue barrier to presidential control, rather than a useful tool thereof, as *Morrison* held. 487 U.S. at 696. In this connection, it warrants mention that *Humphrey's Executor* and *Wiener*, in which the removed officials prevailed, were suits for backpay in the Court of Claims, not emergency suits for injunctions to block removal. *See Wiener*, 357 U.S. at 350–51; *Humphrey's Executor*,[12] 295 U.S. at 618–19. No one has put forward an example of the President being blocked from removing an official at the FHFA Director's level. Thus, the actuality of the protection in practice is anyone's guess.[13]

Moving from generalities to specifics, the FHFA does not exhibit undue insulation. As Judge Costa's opinion explains, the FHFA undertook every action at issue here by agreement with the Secretary of the Treasury, a purely executive officer serving at the pleasure of the President. The President thus had direct control via the bargaining power of the Secretary.

Moreover, two unusual features present in *Free Enterprise Fund* are not present here. First, the statutory grounds for removal of PCAOB members set

---

and eight other agencies had five, ten agencies had six, and four agencies had seven. *See* Datla & Revesz, 98 CORNELL L. REV. at 825.

[12] Humphrey had died; hence that case's unusual name.

[13] Justice Scalia's noted dissent in *Morrison* delved into the difficult political dynamics likely to engulf presidential removal of an official statutorily protected against removal without cause. *See* 487 U.S. at 702–03 (intuiting that "[t]he context of this statute is acrid with the smell of threatened impeachment," and noting the "bitter power dispute" giving rise to the case). Concededly, we have a duty to determine the constitutionality of statutes. *See Zivotovsky ex rel. Zivotovsky v. Clinton*, 566 U.S. 189, 197 (2012) (relating removal jurisprudence to the political-question doctrine). But, to the extent we find ourselves basing constitutional reasoning on hypothesized trajectories of interbranch politics, it is cause for reflection on the wisdom of what we are doing. For a nuanced and somewhat contrary view of how such hypothesizing might be factored into adjudication, see Adrian Vermeule, *Conventions of Agency Independence*, 113 COLUM. L. REV. 1163 (2013).

No. 17-20364

an "unusually high standard." 561 U.S. at 502–03.[14] By contrast, the FHFA's authorizing statute, as noted above, says merely that the Director shall serve a five-year term "unless removed before the end of such term for cause by the President." 12 U.S.C. 4512(b)(2). Though this provision is the centerpiece of Appellants' constitutional claim and of the majority opinion's constitutional remedy, no party and no part of the majority opinion suggests what this text should mean. It is at least quite plain that the text sets a lower bar than the PCAOB statute.[15] Second, members of the PCAOB were removable only by formal order of the SEC, and such orders are subject to judicial review. *Free Enter. Fund*, 561 U.S. at 502 (citing 15 U.S.C. § 78y(a)(1)). The President would thus have to persuade not only the SEC commissioners but also an Article III court that removal was appropriate. No such obstacle exists here.

Finally, the nature of the FHFA's function and the character of the Director's office matter, even though *Morrison* downgraded *Wiener*'s and *Humphrey's Executor*'s inquiries from a determinative to a subsidiary level. *See Morrison*, 487 U.S. at 691. The majority and dissenting opinions on Appellants' statutory claims cover the relevant ground. As their discussions make clear, the FHFA Director wields no prosecutorial power as the independent counsel in *Morrison* had. The Director has powers of regulation

---

[14] "A [PCAOB] member cannot be removed except for willful violations of the [Sarbanes–Oxley] Act [of 2002], Board rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance—as determined in a formal Commission order, rendered on the record and after notice and an opportunity for a hearing. [15 U.S.C.] § 7217(d)(3); see § 78y(a). The Act does not even give the Commission power to fire Board members for violations of *other* laws that do not relate to the Act, the securities laws, or the Board's authority. The President might have less than full confidence in, say, a Board member who cheats on his taxes; but that discovery is not listed among the grounds for removal under § 7217(d)(3)." 561 U.S. at 503.

[15] *See* Datla & Revesz, 98 CORNELL L. REV. at 788 ("Statutes that specify that an appointee cannot be removed except for 'good cause' confer the weakest protection," in contrast to statutes enumerating specific grounds).

and enforcement, like the PCAOB, though only over the government-sponsored enterprises, Fannie Mae and Freddie Mac, and affiliated entities. *See Free Enter. Fund*, 561 U.S. at 485–86 (PCAOB's powers); 12 U.S.C. § 4631 (Director's cease-and-desist proceedings). This appeal does not arise from the use of those powers, nor has any party shown us examples of their misuse. Instead, this appeal arises from the FHFA's conservatorship function,[16] a role one would be hard-pressed to characterize as near the heart of executive power.[17] To the extent that the Supreme Court's removal doctrine has been animated by a concern for preserving presidential control over the core of that power, this is not a case that should stir us to act.

\*\*\*

Regarding Appellants' constitutional claim against the FHFA, I see only reasons for caution and skepticism, and none for action. Neither the Constitution's text, nor the Supreme Court's constructions thereof, nor the adversary process in this litigation has given us much ground on which to declare the FHFA's design unconstitutional. If so thin a record may be made the basis for invalidating Congress's considered response to a major crisis in American life, I am apprehensive about the responsible use of our nullification power henceforth.

---

[16] The Secretary of the Treasury, an appellee in this matter, relies on our caselaw distinguishing the "non-governmental" power wielded by agencies acting as conservators or receivers of struggling financial institutions from the power wielded by agencies acting as regulators. *See, e.g.*, *United States v. Bezborn*, 21 F.3d 62, 68 (5th Cir. 1994) (concerning the Resolution Trust Corporation, a model for the FHFA's design).

[17] *Cf.* A. Michael Froomkin, Note, *In Defense of Administrative Agency Autonomy*, 96 YALE L.J. 787, 809–12 (1987) (identifying a given power's enumeration in Article I versus Article II as the key criterion in determining whether Congress may insulate from presidential control an agency acting pursuant to that power).

No. 17-20364

GREGG COSTA, Circuit Judge, joined by STEPHEN A. HIGGINSON, Circuit Judge, dissenting in part:

In a separation-of-powers case, our vigilance should first be directed at the constitutional limits on our own power. *Raines v. Byrd*, 521 U.S. 811, 819 (1997) ("[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."). We have failed in that duty. In concluding that unravelling the Net Worth Sweep is not the remedy for the allegedly unconstitutional insulation of the FHFA, the court recognizes that the President has always maintained "oversight" of the Net Worth Sweep. Majority Op. (Remedy) 58. But that conclusion does not just resolve the final question for the constitutional claim. It also answers the first question any case poses: Is there jurisdiction?

The answer is "no" because presidential control of the Net Worth Sweep means there is no connection between the good-cause removal provision for FHFA Directors that plaintiffs challenge and the injury from the New Worth Sweep they allege. In other words, the limitation on the removal power did not cause their injury.

The requirement that an alleged constitutional defect caused the plaintiff's injury is part of the threshold standing inquiry—the standing lingo is "traceability"—that ensures we are only deciding constitutional issues when they arise in "cases" or "controversies." *Raines*, 521 U.S. at 818–19. For numerous reasons described below (some of which are recognized in the court's remedial ruling), the Net Worth Sweep is not traceable to the for-cause limitation on the President's power to remove the FHFA Director. In deciding whether Congress has violated the separation of powers at the behest of plaintiffs who lack standing, we violate the separation of powers ourselves. *See*

*Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013) ("The law of Article III standing . . . is built on separation-of-powers principles.").

This is not just a case in which plaintiffs fail to prove standing; the history and nature of the Net Worth Sweep, as well as the Shareholders' own allegations, disprove standing. Let us count the ways the record refutes the required causal link.

For starters, the Acting Director of the FHFA who agreed to the Third Amendment was subject to full removal power. *See* 12 U.S.C. § 4512(f) (allowing Acting Directors with no limits on the President's ability to remove them). Recognizing the problem for this lawsuit if the FHFA was not insulated from presidential control at the Net Worth Sweep's inception, the majority opinion contends that the for-cause limit on removal also applies to Acting Directors. Maj. Op. 48. This novel reading is a stark departure from textualist principles. Unlike the tenure protection the statute provides the FHFA's Senate-confirmed Directors, 12 U.S.C. § 4512(b)(2), it does not impose a for-cause limitation on the removal of Acting Directors. 12 U.S.C. § 4512(f). "[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) (quotations omitted).

That Congress created the FHFA as "an independent agency," Majority Op. at 48 (citing 12 U.S.C. § 4511(a)), is no license for us to graft onto the statute a for-cause limitation on removal of Acting Directors that Congress did not include.[1] As the Office of Legal Counsel recently pointed out, "Congress

---

[1] The court is looking in the wrong place for the removal power over Acting Directors when it states that Section 4512(f) "does not explicitly address removal." Majority Op. at 48.

does not, by purporting to give tenure protection to a Senate-confirmed officer, afford similar protection to an individual who temporarily performs the functions and duties of that office when it is vacant." *Designating an Acting Director of the Bureau of Consumer Financial Protection*, 41 Op. O.L.C. ___, 2017 WL 6419154, Slip Op. at 11 (Nov. 25, 2017). The D.C. Circuit agrees that courts should not create for-cause removal restrictions for officers Congress does not explicitly protect. *Swan v. Clinton*, 100 F.3d 973, 988 (D.C. Cir. 1996) (refusing to assume certain officials retained removal protection after their terms expired because the statute allowing those officials to continue in a "holdover capacity" made no mention of such protection). No authority has ever read in tenure protection for acting officials not subject to Senate confirmation.[2]

Doing so for the first time here is particularly problematic because penciling in a for-cause limitation on the removal of Acting Directors creates a constitutional issue. In interpreting statutes, we are supposed to avoid constitutional difficulties, not create them. *Edward J. Bartolo Corp. v. Fla.*

---

That power comes from the Constitution, not Congress. *Myers v. United States*, 272 U.S. 52, 163–64 (1926). One would thus search in vain for a statute giving the President authority to remove the Attorney General, the Secretary of Defense, or any other cabinet secretary.

[2] *Wiener v. United States* read in tenure protection only for Senate-confirmed officials, not for acting officials, who in another respect are already exclusively the product of presidential power because they do not go through the advice-and-consent process. 357 U.S. 349, 350 (1958). And unlike the FHFA statute and the CFPB statute OLC addressed, *Wiener* was not a case in which Congress extended for-cause protection to one kind of officer and not to another. The "expressio unius est exclusio alterius" canon thus had no role in *Wiener*. Instead, it was addressing a complete silence as to removal. Here there is no "congressional failure of explicitness"—Congress explicitly gave tenure protection only to Senate-confirmed Directors. *Id.* at 352. Finally, *Wiener* predates *Morrison v. Olson*'s shift in removal power cases from a focus on the nature and function of the office in question (that is, whether the officer performing purely executive functions and therefore in need of greater presidential control) to one about the degree to which the president's prerogative is impaired. *See* 487 U.S. 654, 691 (1988). The "intrinsic judicial character" of the War Claims Commission made its members one of the stronger candidates for tenure protection under the then-governing conception of removal power. *Wiener*, 357 U.S. at 355.

*Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

Why turn these cardinal rules of statutory construction upside down? Because the implication is quite clear when the statute governing Acting Directors is read according to its plain language: If the FHFA agreed to the Net Worth Sweep when its leader was fully accountable to the President, then any injury that policy caused is not traceable to the for-cause removal limitation the Shareholders seek to challenge. Indeed, this may be why none of the numerous other statutory challenges to the Net Worth Sweep that courts of appeals have decided included the constitutional claim about the removal power. *See Jacobs v. FHFA*, 908 F.3d 884 (3d Cir. 2018); *Saxton v. FHFA*, 901 F.3d 954 (8th Cir. 2018); *Roberts v. FHFA*, 889 F.3d 397 (7th Cir. 2018); *Robinson v. FHFA*, 876 F.3d 220 (6th Cir. 2017); *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). As for the only other case that challenged the removal power in connection with the Net Worth Sweep, a court dismissed it for lack of standing, recognizing that the policy came from an Acting Director subject to full presidential control. *Bhatti v. FHFA*, 332 F. Supp. 3d 1206, 1213–14 (D. Minn. 2018), appeal docketed, No. 18-2506 (8th Cir. July 16, 2018).

The role of a presidentially accountable FHFA official in agreeing to the Net Worth Sweep is enough to reject traceability. But there is more.

The Shareholders' allegations confirm that the Third Amendment was not the product of any improper insulation of the FHFA from presidential control. In fact, their theory is the opposite—that the Third Amendment was

111

a "deliberate strategy" of the Obama Administration. The complaint often refers FHFA and Treasury collectively as "the Agencies," not as independent actors. The Shareholders allege that "those *Agencies* initiated a long-term policy of seeking to seize control of Fannie and Freddie." They further contend that the Net Worth Sweep was part of "*the Administration's* plans to keep Fannie and Freddie in perpetual conservatorship."

Treasury's role provides even more proof that the Net Worth Sweep is not traceable to the for-cause removal limitation. The necessary and ongoing involvement of an agency not suffering from any alleged constitutional defect is an unusual feature in a separation-of-powers case.[3] Ever since Treasury was established in 1789 as the third department in the executive branch,[4] its secretary has been subject to at-will removal. So even if the President could not express any disapproval of the Net Worth Sweep policy through the FHFA once a Senate-confirmed Director replaced the Acting Director, the Treasury Secretary was always an outlet for any such views. Yet Treasury has continued to accept the dividends for each of the past 27 quarters (since the Third Agreement was signed in August 2012), showing that Treasury's leadership has not viewed the Net Worth Sweep as out of step with the preferred policy of either the Obama or Trump Administration. If that stance

---

[3] Indeed, the Treasury Secretary is the lead defendant in this case, demonstrating that the executive branch is enforcing the policy that the Shareholders contend is the product of an improperly insulated bureaucrat.

[4] The First Congress created Treasury on September 2, 1789. An Act to Establish the Treasury Department, 1 Stat. 65, Ch. 12, 65–67 (1789). Earlier in that first year of the republic, the State Department (then called the Department of Foreign Affairs) was created on July 27 and the War Department on August 7. An Act for Establishing an Executive Department, to Be Denominated the Department of Foreign Affairs, 1 Stat. 28, Ch. 4, 28–29 (1789); An Act to Establish an Executive Department, to Be Denominated the Department of War, 1 Stat. 49, Ch. 7, 49–50 (1789).

ever changes, all it would take is for the President to direct the Treasury Secretary to stop accepting the dividends.

Looking at the government officials involved in both the creation and continuation of the Net Worth Sweep leads to one conclusion: The injury Shareholders complain about in no way flows from any limits on the President's ability to influence FHFA policy.

Nor can the Shareholders rely on "regulated entity" standing. That doctrine describes removal power cases in which courts have found standing because the party bringing the challenge is under investigation. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 487–88 (2010); *Morrison v. Olson*, 487 U.S. 654, 667–68 (1988); *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 82 (D.C. Cir. 2018). But those cases were brought by the individuals or corporations subject to agency authority. In contrast, the FHFA is not "overseeing" or regulating the Shareholders. To the extent it is engaged in ongoing oversight of anything, it is of the government sponsored entities. Corporate law distinguishes between a corporation and its shareholders for standing purposes; a shareholder, or even a majority of them, cannot litigate in the shoes of the corporation.[5] *See Dole Food Co. v. Patrickson*,

---

[5] A derivative suit is the notable exception. As noted in the majority opinion, our sister circuits have determined that the FHFA, not the Shareholders, has sole authority to bring a derivative suit. Maj. Op. 21–22. *See also Roberts*, 889 F.3d at 408; *Perry Capital*, 864 F.3d at 624. And while two circuits have found an exception in an analogous situation—when the FDIC as conservator of a bank has a conflict of interest with respect to a particular claim— no such exception to HERA's grant of "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder" to the FHFA as conservator appears in the statutory text. 12 U.S.C. § 4617(b)(2)(A)(i); *Roberts*, 889 F.3d at 409–10.

But those issues arise in the context of whether Shareholders can bring their statutory claim. The majority opinion concludes that this is a direct shareholder action. That analysis does not carry over to standing for the constitutional claims based on regulated *entity* status. For that, it has always been the entity being regulated—not its shareholders—that has standing to challenge the structure of the regulating agency.

538 U.S. 468, 474-75 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets . . . ." (citations omitted)); *Fox v. Harbottle*, 2 Hare 461 (Eng. 1843) (seminal corporate law case holding that the proper plaintiff in an action alleging an injury to the corporation is the corporation). Think of the potential for chaos if the law were otherwise. Any shareholder of a corporation—for major ones like Wal-Mart or GE we are talking about tens of thousands of potential plaintiffs—could claim to represent the company despite shareholders holding widely varying views on issues affecting the corporation. Consistent with the long-established rule that a business entity has to litigate on its own behalf, no case has recognized that the shareholders of a regulated entity have standing to bring constitutional challenges to the structure of the regulator. That astonishingly expansive view of regulated entity standing cannot be the law.

So if Shareholders have standing at all, it must be founded on harms the Net Worth Sweep directly inflicts on them. On that score, while the standing requirements are sometimes relaxed in separation-of-powers cases,[6] they are not removed. *See Bond v. United States*, 564 U.S. 211, 225 (2011) (continuing to require that a plaintiff must show an "actual or imminent harm that is concrete and particular, fairly traceable to the conduct complained of, and likely to be redressed by a favorable decision"). The Supreme Court has

---

[6] One important way standing is relaxed is that we do not require the branch of government whose powers are being encroached to bring the separation-of-powers claim. Because structural limitations in the Constitution protect individual liberty, affected individuals can bring such claims. *See Bond v. United States*, 564 U.S. 211, 222–23 (2011) (discussing the rationale). But that does not mean they don't have to be affected by the allegedly unconstitutional law.

loosened the standing inquiry when it was not possible to know if the allegedly unconstitutional structure of an agency caused the challenger's injury. *See Free Enter. Fund*, 561 U.S. at 512 n.12. Given the usual difficulty of proving that "counterfactual world," plaintiffs do not have to prove that causation is more than a possibility when the alternative reality is unknowable. *Id; see also Landry v. F.D.I.C.*, 204 F.3d 1125, 1131 (D.C. Cir. 2000) (explaining the traceability requirement is relaxed when it is "difficult or impossible for someone subject to a wrongly designed scheme to show that the design . . . played a causal role in his loss").[7] But it is one thing to give plaintiffs the benefit of the doubt when we cannot know if a properly structured agency would have taken the same action. It is quite another to ignore the traceability requirement when there is no doubt that the alleged constitutional error did not cause the plaintiffs' injury. That is the case here. We know the Net Worth Sweep is a presidentially-sanctioned policy because a Treasury Secretary and Acting Director of FHFA subject to full removal authority adopted the policy, and the presidentially-controlled Treasury has continued to enforce it. If there is standing even in this situation when real world events disprove traceability, then there is nothing left of the Article III limitation.[8]

---

[7] In its standing discussion, court cites another line from *Free Enterprise*—that "the separation of powers does not depend on the views of individual Presidents, nor on whether 'the encroached-upon branch approves the encroachment.'" Majority Op. 44 (quoting *Free Enter. Fund*, 561 U.S. at 497 (quoting *New York v. United States*, 505 U.S. 144, 182 (1992))). But the Supreme Court did not make that comment in discussing standing. It instead was directed at the merits, pointing out that presidential acquiescence in a limit on removal power does not eliminate the constitutional defect. *Free Enter. Fund*, 561 U.S. at 496. The standing inquiry requires us to answer not whether "the encroached-upon branch approves the encroachment," but instead whether the encroachment caused the injury.

[8] Two other cases the Shareholders rely on are inapposite. *Noel Canning* arose directly from an enforcement action brought by the challenged agency, so standing was not even discussed. *N.L.R.B. v. Noel Canning*, 573 U.S. 513 (2014). Beyond that, the case involved an unconstitutional appointment, not an improperly insulated agency. That is an important distinction—any action an improperly appointed agency official takes is "void *ab*

No. 17-20364

Because presidential control over the creation and enforcement of the Net Worth Sweep refutes any link between it and the challenged limits on presidential oversight of the FHFA, Shareholders have little more claim to litigate the structure of that agency than any taxpayer would. *Hein v. Freedom from Religion Found.*, 551 U.S. 587, 609–10 (2007) (recognizing that taxpayer standing generally does not exist). If they could be parties to this case, most taxpayers would present a different perspective on the Net Worth Sweep. It has helped repay the roughly $190 billion taxpayers lent to bail out Fannie and Freddie before the 2008 financial collapse—a key component of the recovery from the Great Recession given the outsized role of Fannie and Freddie in the housing market.[9] Plaintiffs who invested before the collapse would have lost their entire investment were it not for the bailout. Those who have invested since have paid "pennies on the dollar" in a speculative play based on hopes

---

*initio."*  *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 493 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014). Whereas a lack of authority permeates every agency action, a lack of oversight only injures a regulated party if the required oversight would have made a difference. *Compare Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018) (vacating and remanding decision of an improperly appointed ALJ) *with Free Enter. Fund*, 561 U.S. at 508 (rejecting the "broad holding" that improper insulation rendered the challenged agency "and all power and authority exercised by it in violation of the Constitution" (quotation omitted)).

 *Bowsher v. Synar* may provide even less assistance. 478 U.S. 714 (1986). For one, as Judge Higginson points out, that case is less about limiting the President's ability to control an agency and more about placing executive authority in the hands of a legislative officer. Higginson Op. at 3. And in any case, unlike here, in *Bowsher* there was evidence that the constitutional defect prevented the President from carrying out his preferred policy. *See* Brief for the United States, *Bowsher v. Synar*, 478 U.S. 714 (1986), 1986 WL 728082, at \*44–51. Indeed, the central purpose of the statute challenged in *Bowsher* was to tie the President's hands and force him to sequester funds hand-selected by a Comptroller General who answered directly to Congress. *Bowsher*, 478 U.S. at 718. So standing for union members whose cost of living adjustments were withheld as a result of sequestration was easily satisfied—their money was sequestered at the behest of a Comptroller General who never should have had that authority in the first place. *Id.* at 721.

 [9] Shareholders point out that now, more than a decade later, the dividends have repaid the billions lent. But looking only at the principal ignores the return one would expect based on the risk the enormous sum would not be repaid and the time value of money.

No. 17-20364

that either the Treasury Department would change the Net Worth Sweep policy or that the courts would undo it for them. *See* Robert Stowe England, *Against All Odds: The Long Bet on Fannie Mae and Freddie Mac*, Institutional Investor, Sept. 6, 2013.[10] The former may happen. Treasury is reviewing whether to end the conservatorship, yet another reminder that the President has always held full policymaking authority over this issue. Andrew Ackerman, *Administration Nears Plan to Return Fannie, Freddie to Private Ownership*, WALL ST. J., May 30, 2019.[11] But if we were to grant Shareholders that relief based on their separation-of-powers claim, they would be receiving not just a financial windfall. Unravelling the Net Worth Sweep because of limits on the removal power that had nothing to do with the creation or continuation of that financial policy would also be giving Shareholders a constitutional windfall.

---

[10] Available at https://www.institutionalinvestor.com/article/b14zbcy3kts0t7/against-allodds-the-long-bet-on-fannie-mae-and-freddie-mac.

[11] Available at https://www.wsj.com/articles/administration-nears-plan-to-return-fannie-mae-freddie-mac-to-private-ownership-1155925207.

No. 17-20364

WILLETT, Circuit Judge, joined by JONES, SMITH, ELROD, HO, ENGELHARDT, and OLDHAM, Circuit Judges, dissenting in part:

In my view, the proper remedy for Count IV is to vacate the Third Amendment. I respectfully dissent from the court's decision to instead grant a prospective remedy.

I

When a plaintiff with Article III standing challenges the action of an unconstitutionally-insulated officer, that action must be set aside. In *Bowsher v. Synar*, the Supreme Court held the Comptroller General could not prescribe budget reductions because he was not removable by the President.[1] "Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey."[2] The Comptroller General exercised executive power: His role required him to "interpret" the law and "exercise judgment" in applying it.[3] Because he did so outside the President's supervision, the Court set aside his sequestration order. The Court affirmed the district court's judgment "that the presidential sequestration order issued . . . pursuant to the unconstitutional automatic deficit reduction process be, and hereby is, declared without legal force and effect."[4]

*Synar*'s remedial approach applies here. It is the only Supreme Court case that presented the issue. In *Myers v. United States*, the Court upheld a postmaster's removal, so it had no need to grant relief against past government

---

[1] 478 U.S. 714, 736 (1986).

[2] *Id.* at 726 (quoting *Synar v. United States*, 626 F. Supp. 1374, 1401 (D.D.C. 1986)).

[3] *Id.* at 733.

[4] *Synar*, 626 F. Supp. at 1404, *aff'd*, 478 U.S. at 736.

action.[5] In *Morrison v. Olson*, the Court found no constitutional defect in the independent counsel's removal protection, so it granted no relief.[6]

In *Free Enterprise Fund*, the Court held the Public Company Accounting Oversight Board's double for-cause removal protection unconstitutional.[7] But no Board action had become final against the plaintiff, an accounting firm.[8] So the Court "excised" the offending removal protection from the statute going forward.[9] The plaintiff had standing for prospective relief because the challenged agency "regulate[d] every detail of an accounting firm's practice."[10] The unconstitutionally-insulated regulator inflicted an ongoing injury.

Here, in contrast, FHFA generally regulates the GSEs, not their shareholders. And the Third Amendment, which became final in 2012, caused the Shareholders' injury. So I disagree with Judge Duncan's view that *Free Enterprise Fund*, or any Supreme Court decision, counsels against a vacatur remedy in this case. And the Shareholders' lack of "regulated party" standing separates me from Judge Haynes's remedial theory.

Despite having no occasion to vacate agency action, *Free Enterprise Fund* reinforces *Synar*'s principle that an unconstitutionally-insulated officer may not exercise executive power. "[T]he Framers sought to ensure that 'those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'"[11] "By granting the Board executive power

---

[5] 272 U.S. 52, 176 (1926); *see id.* at 106.

[6] 487 U.S. 654, 691–92 (1988).

[7] *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496 (2010).

[8] *Id.* at 490.

[9] *Id.* at 509.

[10] *Id.* at 485.

[11] *Id.* at 498 (quoting 1 Annals of Cong. 499 (J. Madison)).

without the Executive's oversight, this Act subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts. The Act's restrictions are incompatible with the Constitution's separation of powers."[12]

## II

Unconstitutional protection from removal, like unconstitutional appointment, is a defect in authority. Appointments Clause decisions routinely set aside agency action. In *Lucia v. SEC*, the Court held that administrative law judges must be appointed by a "head of department," not by staff.[13] As remedy, the Court granted a new hearing before a different ALJ.[14] It disapproved curing the defective appointment by a quick (already-issued) ratification of the ALJ's appointment.[15] Similarly, in *NLRB v. Noel Canning*, the Court held that three NLRB Members were unconstitutionally appointed without Senate advice and consent.[16] It affirmed the Court of Appeals's decision that the NLRB order, issued without a properly-appointed quorum, was "invalid."[17]

These cases are apt because there, as here, a defect in authority made agency action unlawful. In debating the first executive agencies, James Madison insisted the President naturally had "the power of appointing, overseeing, and controlling those who execute the laws."[18] Unlike judicial

---

[12] *Id.*

[13] 138 S. Ct. 2044, 2051 (2018).

[14] *Id.* at 2055.

[15] *Id.* at 2055 nn. 5&6.

[16] 573 U.S. 513, 519 (2014) (interpreting U.S. CONST. art. II, § 2, cl. 3, Recess Appointments Clause).

[17] *Id.* at 521; *see id.* at 557.

[18] 1 Annals of Cong. 463 (1789).

power or (arguably) legislative power, executive power can be delegated.[19] But if an unconstitutional removal protection breaks the "chain of dependence" between the officer and the President, the delegation breaks down too.[20] An unconstitutionally-insulated officer lacks authority to act.[21]

Treasury contends that when agency action is held unlawful, vacatur is not mandatory but subject to equitable remedial authority.[22] And it maintains that the case for such relief here is weak. The Shareholders waited four years to sue; vacatur might disrupt the GSEs' operations or the housing market generally; and the Shareholders wielded 20/20 hindsight to target an initially risky, but now astute, Treasury bargain. It also says the case for equitable relief here is worse than *Synar*, where the statutory fallback provision was ready at hand.[23]

These arguments do not defeat vacatur here. Appointments Clause cases refute the point that vacatur is too disruptive. As a remedial matter, *Lucia* granted the petitioner a new hearing based on an appointment defect that was

---

[19] *See Mistretta v. United States*, 488 U.S. 361, 424 (1989) (Scalia, J., dissenting) (citing *Wolsey v. Chapman*, 101 U.S. 755 (1880); *Williams v. United States*, 42 U.S. 290 (1843)) ("Although the Constitution says that '[t]he executive Power shall be vested in a President of the United States of America,' Art. II, § 1, it was never thought that the President would have to exercise that power personally. He may generally authorize others to exercise executive powers, with full effect of law, in his place.").

[20] *Free Enter. Fund*, 561 U.S. at 498 (quoting 1 Annals of Cong. 499 (J. Madison)); *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2413 (2019) (opinion of Kagan, J.) ("[A]gencies . . . have political accountability, because they are subject to the supervision of the President, who in turn answers to the public.").

[21] *See Free Enter. Fund*, 561 U.S. at 498; Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 ALA. L. REV. 1205, 1242 (2014) ("Removal . . . provides the constitutionally requisite presidential control.").

[22] *Cf. Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967) (stating in APA context that "the declaratory judgment and injunctive remedies are equitable in nature, and other equitable defenses may be interposed"); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–19 (1982) (holding that traditional equitable principles apply to injunctive relief unless Congress intervenes to guide the courts' discretion).

[23] *Cf.* 478 U.S. at 734–36.

common to every single SEC ALJ.[24] *Noel Canning* held an NLRB order invalid because of three defective appointments, which infected all the Board's actions during those Members' tenure.[25] If setting aside agency action was proper in those cases, it is proper here. FHFA and Treasury have other tools to arrange their affairs going forward. The FHFA Director, constitutionally supervised by the President, generally can enter new agreements or ratify past ones that are not challenged here. As for the Third Amendment, it must be aside. The Shareholders have invoked judicial review of agency action that injured them in fact and violated the separation of powers.[26]

Treasury's cases urging equitable discretion are distinguishable. They discuss prospective remedies like prohibitory or mandatory injunctions, not vacatur of agency action that violated the separation of powers.[27] In contrast, neither *Synar*, *Lucia*, nor *Noel Canning* discusses equitable-discretion principles or applies the four-factor test for granting an injunction.

## III

Although setting aside agency action is not subject to the four-factor injunction standard, it remains an equitable remedy. Doing so here is like rescinding a contract. "A transfer by an agent, trustee, or other fiduciary

---

[24] 138 S. Ct. at 2049, 2055.

[25] 573 U.S. at 520–21, 557.

[26] *See Bond v. United States*, 564 U.S. 211, 223 (2011) ("If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object."); *Synar*, 478 U.S. at 736 (setting aside sequestration order because "the powers vested in the Comptroller General . . . violate the command of the Constitution").

[27] *See North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (per curiam) (reversing special-election injunction in redistricting case); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 12 (2008) (reversing preliminary injunction against Navy sonar training); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006) (holding that traditional four-factor test applies to injunctions against patent infringement); *Weinberger*, 456 U.S. at 320 (holding that Federal Water Pollution Control Act did not mandate injunctions against its violation).

outside the scope of the transferor's authority, or otherwise in breach of the transferor's duty to the principal or beneficiary, is subject to rescission and restitution."[28] The Third Amendment is the smallest independent agreement that caused the Shareholders' injury, so that is what to rescind. When a contract is rescinded, restitution is generally in order, and the plaintiff may also need to return benefits it received.[29] I would recognize the district court's authority, on remand, to decide the parties' rights and duties to restore their rightful position. So I don't share Judge Haynes's concern that this remedy resembles a "pick-and-choose approach" and grants Shareholders a windfall.

\* \* \*

The Shareholders are entitled to declaratory judgment that the Third Amendment exceeded FHFA's lawful authority because the agency adopted it outside the President's supervision.[30] This analysis also supports an injunction vacating the Third Amendment.[31] In light of recent developments, I would remand Count IV to the district court for entry of a judgment consistent with this opinion.[32]

---

[28] RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 17 (AM. LAW INST. 2011).

[29] See id. ("The transferee is liable in restitution to the principal or beneficiary as necessary to avoid unjust enrichment.").

[30] See Free Enter. Fund, 561 U.S. at 513 (holding petitioners were entitled to declaratory relief that PCAOB standards "will be enforced only by a constitutional agency accountable to the Executive"); see also Kisor, 139 S. Ct. at 2413 (opinion of Kagan, J.) ("[A]gencies . . . have political accountability, because they are subject to the supervision of the President, who in turn answers to the public.").

[31] See Synar, 478 U.S. at 736, aff'g Synar, 626 F. Supp. at 1404 (ordering "that the presidential sequestration order issued . . . pursuant to the unconstitutional automatic deficit reduction process be, and hereby is, declared without legal force and effect").

[32] FHFA's newly appointed Director has publicly indicated he is considering renegotiating FHFA's agreements with Treasury. Andrew Ackerman & Ben Eisen, *Push to Overhaul Fannie, Freddie Nudges Up Mortgage Costs*, WALL STREET J. (June 25, 2019, https://www.wsj.com/articles/trump-push-on-housing-finance-nudges-up-mortgage-costs-11561474203?mod=searchresults&page=1&pos=2).